QUIN BLAIR ENTERPRISES, INC.,
Appellant (Plaintiff below),

v.

JULIEN CONSTRUCTION COMPANY, a
Wyoming Corporation, and the American Insurance Company, a New Jersey
Corporation, Appellees (Defendants below).

JULIEN CONSTRUCTION COMPANY, a
Wyoming Corporation, and the American Insurance Company, a New Jersey
Corporation, Appellants (Defendants below),

v.

QUIN BLAIR ENTERPRISES, INC.,
Appellee (Plaintiff below).

Nos. 5014, 5015.

Supreme Court of Wyoming.

July 3, 1979.

Tom C. Toner of Redle, Yonkee & Arney, Sheridan, signed the brief for appellant in No. 5014 and appellee in No. 5015. Mr. Toner appeared in oral argument on its behalf.

Ernest J. Goppert, Jr. of Goppert, Day & Olson, Cody, signed the brief and appeared in oral argument on behalf of appellees in No. 5014 and appellants in No. 5015.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE, and ROONEY, JJ.

RAPER, Chief Justice.

The principal questions raised in this appeal concern appropriate damages for delay in completing a building contract, the effect of a contractual provision requiring the contractor to request in writing an extension of time to complete the contract, the effect on other contract remedies of an escrow agreement and a "punch-list" which required the contractor to redo work that was incorrectly or defectively done, and the ef-

1. Since all parties to this action have appealed the judgment, we will denominate them as described rather than as appellants and appellees or plaintiffs and defendants.

2. We shall summarize the findings of fact in our own recitation of the factual setting of this case. The conclusions of law reached by the district court are:

"1. The American Insurance Company should not be dismissed from this suit because suit was instituted within two years from the date on which final payment on the contract fell due. The American Insurance Company is liable on its performance bond.
"2. The Defendants' claim for arbitration was waived because of their failure to plead arbitration and because of their participation in this suit requesting affirmative relief.
"3. The completion date of the contract of June 5, 1972 was extended for 41 days until July 15, 1972 due to the Plaintiff assuming the work of clearing the job site.
"4. Julien waived any claims for extension of time resulting from the architect or from weather by failing to request an extension of time under the agreement.

fect of a failure to timely serve notice of suit upon a surety-defendant whom plaintiff alleges is united in interest with the contractor-defendant.

The plaintiff is Quin Blair Enterprises, Inc. (Blair) and the defendants are Julien Construction Company (Julien) and American Insurance Company (American).[1] The district court entered a judgment in favor of Blair in the amount of $28,514.38 and costs of $1,104.20 as damages resulting from the failure of Julien to complete on time the construction of a Holiday Inn in Cody, Wyoming owned by Blair and because Julien constructed portions of that building in a negligent and defective manner. The district court's judgment by reference incorporated findings of fact and conclusions of law announced by the trial judge in a memorandum opinion. Rule 52, W.R.C.P.[2]

Blair asserts:

"1. The district court extended the time for completing the contract because the owner failed to clear the site. This ruling violates the contract which provides that a time extension could be granted for delay caused by the act or neglect of the owner only if a written claim for exten-

"5. Julien breached the agreement with Plaintiff by failing to complete construction by the completion date of 7/15/72 and by constructing the sewer, kitchen floor, west and south parking lots in a negligent, defective manner which was not in accord with the contract plans and specifications.
"6. The Plaintiff is entitled to damages resulting from delay in completion and for negligent, defective construction work by Julien.
"7. Plaintiff was damaged by Julien's breach in the amount of $16,619.38 for loss of rentals and other revenues and in the amount of $11,895.00 for the reasonable cost of repair and replacement of the negligent, defective construction work by Julien.
"8. Punitive damages for breach of contract are not allowed.
"The Plaintiff shall have and recover judgment against the Defendants for the sum of $28,514.38 together with the costs of this action and the Defendants' Counterclaim against the Plaintiff is dismissed with prejudice."

sion was made by the contractor. No written, or even oral, claim for extension was ever made.

"2. Using the rental value theory adopted by the district court, the appellant was entitled to damages caused by the delay in completion in the amount of $92,240.

"3. If [the Supreme Court] rejects the rental value approach used by the district court, the appellant contends that it presented evidence which allowed the court to determine loss of profits." (Bracketed material substituted.)

Julien asserts:

"1. * * * Blair's claim for damages for noncompletion within its contractual 240 day period of time should be barred by [Blair's] own actions which contributed substantially to the delay.

"2. The damages found for negligent construction had been resolved by the 'Escrow Agreement' entered into by the parties on April 6, 1973 and the activities pursuant to that agreement and for failure to give written notice of defects as required by the contract.

"3. * * * [T]he damages found by the lower court for delayed completion were excessive in that the court did not include all expenses in determining lost profits and over compensated [Blair] for net profits from the Restaurant, Bar, and Related Activities." (Bracketed material added.)

American asserts:

"1. The action brought by * * * Blair against * * * American * * should be dismissed as not having been brought timely under the provisions of the Performance Bond."

We will affirm in part, reverse in part and remand with directions.

The factual background is for the most part not in dispute; the legal consequences of the facts are the source of differences. In the late summer of 1971, Julien submitted a bid pursuant to the invitation of Blair to construct a Holiday Inn complex in Cody for the sum of $848,732.00. This bid, along with others, was opened on September 9, 1971, and it was determined that

Julien was the "low" bidder. Julien's bid represented that he "proposes to complete the project within total period of 240 calendar days, which time is to commence upon date of signing of the contract." Julien's bid was effective for thirty days to expire on October 8, 1971. After it was determined that Julien was low bidder, there were a series of oral discussions between Blair and Julien which served to inform Julien that he was the "successful" bidder and which eventually resulted in Julien's preparing a contract at the request of Blair. (American Institute of Architects [AIA] Document A101—"Standard Form of Agreement Between Owner and Contractor.") The contract, in its body, sets out that it was made on October 8, 1971, was signed by Blair on October 22, 1971, and by Julien on October 25, 1971.

Other facts will be considered in connection with our discussion of the issues raised: first, the time to complete the contract, the delay charged and damages in that connection; next, faulty construction; and finally, the performance bond.

With respect to time, Article 4 of the contract states:

"The Work to be performed under this Contract shall be commenced *immediately* and completed *240 days*" (emphasis indicates blanks in the contract form which were filled in by a typewriter).

The general conditions provide in part:

8.1.2 "The date of commencement of the Work is the date established in a notice to proceed. If there is no notice to proceed, it shall be the date of the Agreement or *such other date as may be established therein.*" (Emphasis added.)

Article 4 was followed by a parenthetical sentence: "(Here insert any special provisions for liquidated damages relating to failure to complete on time.)" No special provisions were inserted. Article 8, paragraph 8.2, made a listing of the contract documents which constituted the entire agreement between the parties. One of the documents there listed was, "Contractor's Proposal, Pages A4a–01 & A4A–02 dated

Sept. 9, 1971 Submitted by the Julien Construction Company and signed by H. W. Julien, Pres." This document is the one referred to above as Julien's Bid which contained the language that Julien was to complete the building project within 240 days commencing *upon date of signing the contract.*[3]

There was much testimony in the record about the clearing of the site on which the Holiday Inn was to be constructed. The site was occupied by a number of small log cabins which were a part of the original "Buffalo Bill Village" complex. Blair undertook to remove these cabins so as to preserve them for reuse within the Village. Julien asserts that as a result of Blair undertaking to clear the site, he was delayed in beginning his construction work for a substantial period of time. Another contractual document, AIA Document A201— "General Conditions of the Contract for Construction," was made a part of the Contract by Article 1. Article 8 of AIA Document A201 deals with "Time." The pertinent paragraphs read:

"8.3 DELAYS AND EXTENSIONS OF TIME

"8.3.1 If the Contractor is delayed at any time in the progress of the Work by any act or neglect of the Owner or the Architect, or by any employee of either, or by any separate contractor employed by the Owner, or by changes ordered in the Work, or by labor disputes, fire, unusual delay in transportation, unavoidable casualties or any causes beyond the Contractor's control, or by delay authorized by the Owner pending arbitration, or by any cause which the Architect determines may justify the delay, then the Contract Time shall be extended by Change Order for such reasonable time as the Architect may determine.

"8.3.2 *All claims for extension of time shall be made in writing to the Architect no more than twenty days after the occurrence of the delay; otherwise they shall be waived.* In the case of a continuing cause of delay only one claim is necessary." (Emphasis added.)

The record is clear that no written request for extension of time was ever made.[4]

Julien was obligated to complete the construction work within 240 days. However, there was a significant amount of finishing work that had to be done by Blair under separate contracts before the motel rooms would be ready for use. This work is described in Specification Number 20200 entitled "Holiday Inn, Cody, Wyoming," listed as one of the contract documents in the signed contract:

"WORK A. FOLLOWING ITEMS SHALL BE FURNISHED AND INSTALLED BY THE OWNER UNDER OTHER CONTRACTS FOLLOWING PRIME CONTRACTORS COMPLETION OF THE PROJECT.
NOT INCL.

TWX—PBX
FURNITURE
MIRRORS (FRAMED-FURNITURE TYPE)
OFFICE FURNISHINGS AND EQUIPMENT
TELEVISION SETS AND MOUNTING
SHOWER CURTAINS AND PINS
CARPET AND METAL CARPET EDGING STRIPS.
DRAPERIES AND DRAPERY TRACKS.
UNIT FOR HOUSE-KEEPING RECORDS.
MIRRORS.
FILE IN REGISTRATION COUNTER AND METAL FILE CABINETS.
FRAMES FOR PLACARDS ON BACKS OF DOORS TO RENTAL UNITS.
RECORD PLAYER OR SOUND SOURCE
RESERVATIONS CONSOLE
CASH REGISTERS
SHOWER CURTAINS AND PINS
LANDSCAPING AND SOD WORK"

Julien testified that the first block of 18 rooms were turned over to Blair on July 17, 1972. However, these rooms were ready for rental at that point with furniture installed. The construction work by Julien

---

**3.** The district court found that the 240-day completion period was to run from October 8, 1971 and that the completion date was June 5, 1972. We do not agree with this finding as shall be explained.

**4.** The district court found that Blair had delayed Julien by 41 days in getting started to work. This should not be confused with delay in actual completion of the contract. The district court also found that the parties waived application of paragraph 8.3.1 and 8.3.2 cited above, by their conduct. The district court determined that it would be inequitable to hold Julien to the written request requirement when Blair was the uncontroverted cause for delay in beginning construction. We also disagree with this finding.

was completed at least two weeks prior to that time which means that Julien had substantially completed his contract obligations with regard to those rooms on July 3, 1972. Julien also testified that all rooms were completed insofar as his obligations were concerned on August 7, 1972. The record is somewhat confusing on this matter and it is difficult to sort out exactly when the rooms were finished by Julien, but it can be done from reading all the testimony together and referring to the defendants' Exhibit A. We can arrive at undisputed, firm dates. Since this is the method which we determined was used by the parties, as well as the trial judge, we are comfortable with this determination of room completion dates. There were 82 units in all to be completed, and they were finished in blocks by Julien:

(1) Eighteen (18) units on the first floor were completed on July 3, 1972.

(2) The remaining twenty (20) units on the first floor were completed on July 20, 1972.

(3) Twelve (12) units on the second floor were completed on July 26, 1972.

(4) Thirteen (13) units on the second floor were completed on July 28, 1972.

(5) Three (3) units on the second floor were completed on August 7, 1972.

(6) The remaining sixteen (16) units were completed on August 11, 1972.

■ As a result of its findings, the district court determined that Julien should have completed all construction on July 15, 1972 and that the work was not finally completed until August 11, 1972, a period of 27 days. The court found that Blair was entitled to damages during this period. The district court calculated these damages to be $16,619.38.[5]

Julien asserts that the trial court erred in finding that the date of the agreement was the date from which it would begin counting the 240 days allowed to Julien to complete the construction project. The record reflects that bids were invited on this construction project in the late summer of 1971. Blair wanted to add the 82-unit Holiday Inn to his already established Buffalo Bill Village complex in Cody, Wyoming. It was Blair's intention, according to his testimony, that the motel was to be completed in time for the tourist season (June-August) in 1972. Julien, on the other hand, testified that he did not understand that a particular completion date was contemplated. The contract documents mention just about every possibility: 1. The contract was dated October 8, 1971. The contract further stated that the commencement date for the work was in the notice to proceed, and if there was no notice to proceed, then the commencement date would be the *date of the agreement*, October 8, 1971. 2. The contract also stated that Julien was to begin work "immediately" and complete in 240 days. No provisions are made in the contract for a firm date of completion nor were any provisions made for liquidated

5. We have reconstructed the trial judge's computation of damages, using completion dates as he found them:

| | Number of Rooms | Room Rental Rate | | Days Late | | Occupancy Rate | | Lost Room Rentals |
|---|---|---|---|---|---|---|---|---|
| 1. | 23 | x $25.36 | x | 4 | x | 95% | = | $ 2,216.46 |
| 2. | 12 | x $25.36 | x | 9 | x | 95% | = | $ 2,601.93 |
| 3. | 12 | x $25.36 | x | 11 | x | 95% | = | $ 3,180.14 |
| 4. | 17 · | x $25.36 | x | 25 | x | 95% | = | $10,239.10 |

TOTAL $18,237.63

(The first 18 rooms finished were found by the trial judge to be within the 240-day period as he found the effect of delay.) While the trial judge specifically found the completion date to be July 15, 1972, for some reason he started his calculations on July 17, 1972. Damages for loss of bar, restaurant and gift shop business computed at the same rate used by the trial judge ($18,237.63 × $1.17 = $21,338.02) compares with the trial judge's figure of $21,334.95. Our final reconstruction, then, is $18,237.63 + 21,338.02 × .42 (expenses not incurred were determined to be 58% of total lost gross income) = $16,621.76. The trial judge found $16,619.38. There is only $2.38 between our reconstruction and the final figure of the district judge. We find that completion dates of various blocks of rooms as disclosed by the record are indisputably shown by the Daily Project Logs and blueprints. The findings of the trial judge where they vary from our figures are clearly erroneous. We disturb findings of the trial court only where clearly erroneous. *Diamond Management Corporation v. Empire Gas Corporation*, 594 P.2d 964, 1979.

damages. It may at first blush appear difficult to say what is meant by "immediately" here, but the most obvious interpretation would be *immediately upon execution of the contract,* October 25, 1971. 3. The general language of the contract stated that the bidding documents were no part of the contract. However, the paragraph which lists the contract documents includes them. No argument is made that they are not a part of the contract, and under the facts presented, we can only conclude that they are a part of the contract. Julien's bid proposal makes clear that he would complete the project in 240 days, which time is to commence *upon signing of the contract.* Julien signed the contract on October 25, 1971.

 As can be seen, there is a certain element of ambiguity, that is, the various provisions in the various contract papers are capable of being understood in more ways than one. In that case, we strive to give meaning to all the language the parties have used, if that can be done. *Bulis v. Wells,* Wyo.1977, 565 P.2d 487. We need not resort to extrinsic evidence but can find meaning within the contract language. Courts may not rewrite contracts under the guise of interpretation. *McGinnis v. General Petroleum Corp.,* Wyo.1963, 385 P.2d 198. Moreover, courts must construe the contract of the parties as a whole, and meaning should be afforded to all of the language used by the parties if that can be done and a reasonable construction achieved. *Shepard v. Top Hat Land & Cattle Co.,* Wyo. 1977, 560 P.2d 730. The primary rule of contract construction is to give effect to the intentions of the parties expressed by the language they employ. *Marathon Oil Co. v. Kleppe,* D.Wyo.1975, 407 F.Supp. 1301, aff'd. 556 F.2d 982; *Pilcher v. Hamm,* Wyo. 1960, 351 P.2d 1041.

 Both parties agreed that the bidding documents were part of the overall contract. Those documents make clear that the 240-day completion period was to commence as of the signing of the contract. Parties to a contract may execute an agreement on one date and provide that all the rights, obligations and liabilities thereto will attach respectively as of a retroactive date. *Canaras v. Lift Truck Services, Inc.,* 1974, 272 Md. 337, 322 A.2d 866. However, when all the parts of this contract are read together, only one conclusion can be reached. It was intended that the 240-day completion period would begin when it signed the contract, i.e. on October 25, 1971. There is nothing in the contract to indicate that either party ever intended that the contract would begin as of the retroactive date. We hold that the contract provisions were that Julien had 240 days from and after October 25, 1971, in which to complete the contract, i. e., the completion date would be *June 22, 1972.*

Blair claims that the district court erred in allowing Julien credit for 41 days (from October 8, 1971, until November 18, 1971), because Blair delayed that long in making the construction site available to Julien. We agree with Blair that the district court improperly allowed this extension of time to Julien.

 Paragraph 8.3.1 and 8.3.2, supra, make plain that Julien was required to request in writing any extensions of time to complete the contract, even if the delay was due to the owner's actions or neglect. It is evident from the record that Julien at no time requested in writing an extension of time to complete the contract.[6] We can see

---

**6.** The district court found that the parties ignored many, if not most of the provisions of their contract. While parties to a contract are free to do this, they must also understand that they may bear the consequences of such disregard when breach becomes a fact of life. As a general rule, if the parties *mutually* adopt a mode of performing their contract differing from its strict terms or if they *mutually* relax its terms by adopting a loose mode of executing

it, neither party can go back upon the past and insist upon a breach, because it was not fulfilled according to its letter. See *Detroit Greyhound Employees Federal Credit Union v. Aetna Life Insurance Company,* 1967, 7 Mich.App. 430, 151 N.W.2d 852, 857. Here there was never any *mutual* agreement to vary any terms. There was unilateral disregard of terms. There were terms neither party ever seemed to be cognizant of or understand. However, there

no reason why we should ignore these plain and unambiguous terms of the contract. They serve a plain and beneficial purpose when disagreement arises. If there is to be an extension of the time, it should be in writing for all to see as contemplated by the contract terms. After competent parties have solemnly contracted, a court should exercise restraint in nullifying its terms and any other practice is dangerous, *Younglove v. Graham & Hill*, Wyo.1974, 526 P.2d 689. When a party makes a contract and reduces it to writing, he must abide by its plainly stated terms. *Chiquita Mining Co. v. Fairbanks, Morse & Co.*, 1940, 60 Nev. 142, 104 P.2d 191. We hold that Julien's failure to request in writing an extension of time to complete the contract is fatal to his contention that he should be allowed additional time to complete this contract due to delay caused by the owner. *Herbert & Brooner Construction Co. v. Golden*, Mo. App.1973, 499 S.W.2d 541; *Flour Mills of America, Inc. v. American Steel Buildings Co.*, Okl., 1968, 449 P.2d 861; *Austin-Grif-fith, Inc. v. Goldberg*, 1953, 224 S.C. 372, 79 S.E.2d 447, 42 A.L.R.2d 1123.[7]

Julien asserts the trial court erred in its determination of when the project was actually completed. We agree that certain adjustments are required by the undisputed facts in the record. Without going into any unnecessary detail, we hold that the record supports the following completion dates, expressed in units: 1. July 3, 1972, 18, 1st floor; 2. July 20, 1972, 20, 1st floor; 3. July 26, 1972, 12, 2nd floor; 4. July 28, 1972, 13, 2nd floor; 5. August 7, 1972, 3, 2nd floor; and, 6. August 11, 1972, 16, 2nd floor.

No other issues are raised by either party in regard to delay and, this being so, the judgment of the trial court is otherwise affirmed. We will remand the case with directions to vacate that part of the court's judgment in conflict with our determination of damages for delay. Our computation is based upon a contract completion date of June 22, 1972, rather than July 15, 1972, as found by the trial judge, and in view of our examination of the undisputed record as to the dates of actual completion:

| | Number of Rooms | | Room Rental Rate | | (Amount) | | Days Late | | (Amount) | | Occupancy Rate | | Lost Room Rentals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | 18 | x | $25.36 | = | $456.48 | x | 11 | = | $ 5,021.28 | x | 95% | = | $ 4,770.21 |
| 2. | 20 | x | $25.36 | = | $507.20 | x | 28 | = | $14,201.60 | x | 95% | = | $13,491.52 |
| 3. | 12 | x | $25.36 | = | $304.32 | x | 34 | = | $10,346.88 | x | 95% | = | $ 9,829.53 |
| 4. | 13 | x | $25.36 | = | $329.68 | x | 36 | = | $11,868.48 | x | 95% | = | $11,275.05 |
| 5. | 3 | x | $25.36 | = | $ 76.08 | x | 46 | = | $ 3,499.68 | x | 95% | = | $ 3,324.69 |
| 6. | 16 | x | $25.36 | = | $405.76 | x | 50 | = | $20,288.00 | x | 95% | = | $19,273.60 |

Lost Room Rentals $61,964.60
(Expenses not incurred equal 58% of total) x .42
Damages for Lost Room Rentals $26,025.13

| Total Lost Room Rentals | | $1.17 of Other Revenues per $1.00 Room Rental | | (Amount) | | Expenses Not Incurred Equal 58% of Total | | Lost Revenue | |
|---|---|---|---|---|---|---|---|---|---|
| $61,964.60 | x | $1.17 | = | $72,498.58 | x | .42 | = | $30,449.40 | $30,449.40 |

TOTAL DAMAGES FOR LOST ROOM RENTALS + OTHER LOST REVENUES $56,474.53

was never any *mutual* agreement to do anything different and the parties must be held bound to their agreements. It is in just such instances as this that it becomes most important to read and strictly construe contracts.

7. We have considered and rejected as inapplicable to the case or inconsistent with other views of this court the cases cited by Julien in defense of their view that no written request was required under the circumstances of this case. They are: *Peter Kiewit Sons Co. v. Pasadena City Junior College District*, 1963, 59 Cal.2d 241, 28 Cal.Rptr. 714, 379 P.2d 18; *Glassman Construction Co., Inc. v. Maryland City Plaza, Inc.*, D.Md.1974, 371 F.Supp. 1154; *Buckley & Company, Inc. v. State*, 1975, 140 N.J.Super. 289, 356 A.2d 56; *Carter v. Sherburne Corporation*, 1974, 132 Vt. 88, 315 A.2d 870.

Julien asserts that the formula used by the district court overcompensated Blair for the delay because the court did not include all expenses in delineating lost profits and overcompensated Blair for net profits from the restaurant, bar, and related activities. This argument is presented in a most general way. Julien has given us no assistance in regard to the standard of review, nor do we find specific authority cited which aids his cause. There is evidence in the record which supports the district court's determination of damages, and we will not disturb it under the circumstances here presented. *Champion Ventures, Inc. v. Dunn*, Wyo.1979, 593 P.2d 832, 835; *Chittim v. Armco Steel Corp.*, Wyo.1965, 407 P.2d 1015; See generally West's Digest System, Appeal and Error, Key Number 1013. The question here is not whether we would have reached a different decision as to damages but whether the district court's decision is supported by the record. We hold that it is. Thus, we fully approve the formula used by the trial court and it should be employed in recomputing the damages for delay, as was done in the original trial of this case. In other words, Blair will receive damages for delay computed from June 22, 1972, until the date each block of rooms was completed as well as damages resulting from loss of revenue to the bar, restaurant, and other associated facilities during these same periods of time.

The trial judge also awarded to Blair damages caused by reason of Julien's negligent construction of the sewer lines, the kitchen floor, and the parking lots. His memorandum opinion contained a discussion of those items:

"1. *The Sewer Line*—The evidence in the Court's opinion shows that the sewer line was installed improperly. There was no evidence presented that indicated the sewer was not laid uphill. Julien attempted to imply that possibly because of improper impaction of the soil, the sewer line had sunk to this uneven grade. In order to assume such a contention, Julien has to argue that the improper compaction was a negligent act caused by the Plaintiff. While the Court considers that the Plaintiff is responsible for some delay caused by his performing the work of clearing the job site, the Court cannot delegate to the Plaintiff the responsibility of proper impaction of the soil. Even though the Plaintiff did perform some filling in of the excavations caused by removal of some of the cabins, the Court attaches to Julien the responsibility of establishing a proper foundation for the building and its related attachments. It is difficult for the Court to perceive a builder before he places such a structure on a site failing to take proper test holes and such other precautions as necessary to ensure proper compaction of the soil. The Court considers the Plaintiff should recover as damages for the replacement of the defective sewer line the sum of $7,658.00.

"2. *The Kitchen Floor*—The evidence preponderates that the kitchen floor was negligently installed. The Court finds that $760.00 will repair the damage.

"3. *The Parking Lots*—As to the sinking of the parking lots, Julien has again attempted to attribute the cause to improper backfilling and compacting. This Court for reasons before stated in its decision on the sewer line holds such responsibility to be that of Julien's. The defect in the parking lots is attributed to the negligence of Julien. The Court awards damages on the West Parking Lot at $1,000 and the South Parking Lot the sum of $2,477.00.

"4. *Roof*—The Court concludes that the Plaintiff failed to show that a defect in the roof existed as a result of the negligent construction of it by Julien. The Court also refuses to award any damages for replacement of the tile in the ceiling. "Julien asserts as a defense to Plaintiff's claim for negligent construction that the matter was completely settled when the parties entered into an escrow agreement in April 1973. The Court holds that said

agreement was not a settlement of the Plaintiff's rights under this contract, it being in the nature of a certificate of substantial completion and in addition the agreement failed to even cover certain items such as the sewer, kitchen or the west parking lot."

The "escrow agreement" entered into by Julien and Blair came about because Blair refused to make the final payment to Julien. Blair owed Julien $131,782.50. Julien filed a Builder's Lien to recover this amount. As a settlement of this lien claim, Blair and Julien agreed that Blair would pay to Julien all of this amount except $16,000.00. This $16,000.00 was placed in an escrow account and was to be paid to Julien when certain items of construction were completed in a satisfactory manner. The satisfactory completion of these items was to be determined by George Tresler, a Cody, Wyoming, architect, and in pertinent part were:

"1. Furnish contractor certification that the roof has been installed in accordance with manufacturers requirements for 20 year Bondable Roof and furnish two year flashing guarantee.

"2. Furnish one year guarantee and subcontract guarantee."

Paragraph 9 of the escrow agreement provided:

"9. The establishment of this escrow and the compliance with the terms hereof does not constitute any waiver or abridgement of the warranties and guarantees, nor waiver of any performance provided for in the Agreement dated the 8th day of October, 1971, between the OWNER and CONTRACTOR; nor does it constitute any waiver upon the labor and material payment bond of the CONTRACTOR, dated the 15th day of October, 1971; nor of the performance bond of the CONTRACTOR, dated the 15th day of October, 1971. It is however, hereby agreed that for the purpose only of determining the start of the CONTRACTOR'S one year warranty that said

warranty period did begin on August 11, 1972, excepting only as to the warranty on the swimming pool which is left open, also excepting any warranties stated to extend for longer periods which warranties also will be deemed to have begun on August 11, 1972."

With regard to the alleged negligent construction, the district court made formal findings which appeared in abbreviated form consistent with his discussion.

■■■■ Julien asserts that the damages found for negligent construction had been resolved by the escrow agreement entered into by the parties on April 6, 1973. Further, Blair's failure to give written notice of defects required by the contract, serves to vitiate parts of this claim. This argument of Julien's is simply unsupported by the record or by pertinent authority. The express findings of the trial court must be sustained unless clearly erroneous or contrary to the great weight of evidence. *True v. Hi-Plains Elevator Machinery, Inc.,* Wyo.1978, 577 P.2d 991.

The district court found the escrow agreement to be a certificate of substantial completion and a certificate of payment. Pertinent portions of the contract serve to explain the meaning of such certificates:

"9.7.1 When the Contractor determines that the Work or a designated portion thereof acceptable to the Owner is substantially complete, the Contractor shall prepare for submission to the Architect a list of items to be completed or corrected. The failure to include any items on such list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents. When the Architect on the basis of an inspection determines that the Work is substantially complete, he will then prepare a Certificate of Substantial Completion which shall establish the Date of Substantial Completion, shall state the responsibilities of the Owner and the Contractor for maintenance, heat, utilities, and insurance, and shall fix the time

within which the Contractor shall complete the items listed therein. The Certificate of Substantial Completion shall be submitted to the Owner and the Contractor for their written acceptance of the responsibilities assigned to them in such Certificate.

"9.7.2 Upon receipt of written notice that the Work is ready for final inspection and acceptance and upon receipt of a final Application for Payment, the Architect will promptly make such inspection and, when he finds the Work acceptable under the Contract Documents and the Contract fully performed, he will promptly issue a final Certificate for Payment stating that to the best of his knowledge, information and belief, and on the basis of his observations and inspections, the Work has been completed in accordance with the terms and conditions of the Contract Documents and that the entire balance found to be due the Contractor, and noted in said final Certificate, is due and payable."

The escrow agreement listed the items to be completed or corrected. It established a date of substantial completion by starting the warranty period on August 11, 1972. George Tresler inspected most of the items on the "punch list" and determined that Julien should receive the final payment of $16,000.00.

From this Julien asserts that Blair waived all claims as to defects in the work. The contract is clear in this regard:

"9.7.5 The making of final payment shall constitute a waiver of all claims by the Owner except those arising from:

".1 unsettled liens,

".2 *faulty or defective Work appearing after Substantial Completion,*

".3 *failure of the Work to comply with the requirements of the Contract Documents,* or,

".4 *terms of any special guarantees required by the Contract Documents."* (Emphasis added.)

And further:

"7.6.1

"The duties and obligations imposed by the Contract Documents and *the rights and remedies available thereunder shall be in addition to and not a limitation of any* duties, obligations, *rights and remedies otherwise* imposed or *available by law."* (Emphasis added.)

Julien's argument is purely rhetorical (no authority of any sort is cited to us), so we can only read it as being a challenge to the sufficiency of the evidence. The matter of the escrow agreement and the alleged failure of Blair to give notice were very much in dispute. The escrow agreement itself disclaimed in paragraph 9, supra, that it was a waiver of warranties or guarantees. Moreover, the escrow agreement is not unambiguously clear as to whether it covered the problems with the kitchen floor and the parking lot problems, at issue here. The record indicates that George Tresler who was the go-between for resolving these matters did not inspect these items and give any final approval to them. The escrow agreement does not deal with the sewer line problem and the record shows that Julien was given notice of the problems that arose over the sewer line and attempted to correct them through the subcontractor who did the plumbing work.[8]

■ The record further discloses that Julien's efforts to correct the sewer line problem were ineffectual. Julien cited no authority either in the district court or on appeal to support its theory that any claim for damages was waived. While certain *patent* defects may be waived by way of such an escrow agreement, or "punch list," and the making of final payment, this is not

---

8. The record contains testimony from the plumbing subcontractor that Julien arranged to clear the sewer line when it backed up and further that the plumbing subcontractor received a letter from Julien indicating that the sewer line problem had not been corrected and that the position of the plumbing subcontractor was "indefensible".

necessarily so, nor would it have that effect on *latent* defects.[9] *Flour Mills of America, Inc. v. American Steel Buildings Co.*, Okl. 1968, 449 P.2d 861, 871; Sweet, Legal Aspects of Architecture, Engineering and the Construction Process, § 23.05, pp. 430–434 (1977); Anno., Partial Payment on Private Building or Construction Contracts As Waiver of Defects, 66 A.L.R.2d 570 (1959); 13 Am.Jur.2d Building and Construction Contracts, §§ 55–59.

The evidence supports all the findings and conclusions of the court with respect to the careless workmanship. The findings and conclusions of the district court are likewise in conformance with the applicable authorities. Insofar as these matters were concerned, sticky factual questions and conflicts had to be decided by the district court. We will not substitute our judgment for that of the trial court where its determination is not clearly erroneous or contrary to the weight of evidence. *True v. Hi-Plains Elevator Machinery*, supra.

Finally, American Insurance Company (American) asserts that the district court erred in finding that it is united in interest with Julien and that the action was commenced against American on February 24, 1975, well within the two-year limitation of American liability. The performance bond given by American to Blair contained this language:

"Any suit under this bond must be instituted before the expiration of two (2) years from the date on which final payment under the Contract falls due."

The final payment under the contract was due and made in January, 1974 pursuant to an agreement between Julien and Blair.

■ The complaint against Julien and American was filed in the district court on February 24, 1975. American was not served with the complaint and summons until September, 1977, about two and one-half years later. Blair asserts that this failure to serve American is not fatal because of Wyoming Rules of Civil Procedure, Rule 3(b):

"For the purposes of *statutes of limitation*, an action shall be deemed commenced on the date of filing the complaint as to each defendant, if service is made on him or on a co-defendant who is a joint contractor or otherwise united in interest with him, within sixty days after the filing of the complaint. * * *" (Emphasis added.)

The district court found that American was united in interest with Julien. The claimed issue raised in regard to this question is whether American is "united in interest" with Julien so as to call Rule 3(b) into play. That rule is inapplicable because there is no "statute" of limitations here involved. The limitations are contained in the contract terms.

We cannot find where any statute of limitations was pleaded by American, as required by Rule 8(c), W.R.C.P. The parties have not cited us to any statute of limitations. American asserted by answer the limitation provided by the performance bond contract.

■ Such provisions, if reasonable, limiting the time within which actions may be brought on building contract bonds are valid and will be enforced. *McWaters and Bartlett v. United States*, 10th Cir. 1959, 272 F.2d 291; *Honolulu Roofing Company v. Felix*, 1967, 49 Haw. 578, 426 P.2d 298; 72 C.J.S. Principal and Surety § 263b; 17 Am.Jur.2d Contractor's Bonds, § 124.

The proper question is whether a "suit under this bond" was "instituted" before the two-year expiration date. It would be a strange concept to consider a suit "instituted" by filing a complaint and letting it languish in a court file for two and one-half years, without any effort to effect service. On February 24, 1975, a summons was issued directed not only to Julien but also to American. The sheriff's return shows only service on Julien. A new summons was

---

9. No issue was raised by the parties in regard to whether there was *patent* or *latent* defects.

issued on September 19, 1977, directed to American and regularly served on the Wyoming Insurance Commissioner, on September 21, 1977.

American moved to quash the last summons on the ground that it was untimely and concurrently filed a shotgun answer. The court never specifically overruled the motion to quash but in its pretrial order declared it "moot", without explanation. The memorandum opinion of the court held that it fell within Rule 3(b), W.R.C.P., so we conclude that to amount to a denial of the motion.

Rule 3(a), W.R.C.P., provides that "[a] civil action is commenced by filing a complaint with the court." That provision is identical to Rule 3, F.R.C.P. Rule 3(b), W.R.C.P. does not appear as part of the Federal Rules.[10] Rule 3(a), W.R.C.P. and Rule 3, F.R.C.P. are in the form they are, without a requirement of service of process as part of the commencement of a lawsuit, because it was felt by the Federal Advisory Committee and Congress that adequate protection against dilatory plaintiffs was afforded by Rule 41(b), F.R.C.P. (Rule 41(b)(1), W.R.C.P.)[11] by dismissal for want of prosecution. Federal Rule 41(b) does not have a 41(b)(2) as in the Wyoming Rule allowing dismissal by the court on its own motion. However, as a matter of approved practice, United States District Courts, do dismiss upon their own motions for failure to prosecute, as a part of the inherent power of calendar control. Wright and Miller, Federal Practice and Procedure: Civil §§ 1051–1056 and 2369–2370. Rule 14, Uniform Rules, District Courts, Wyoming[12] provides for dismissal after six months of inaction.

Under the Federal Rule, long delay in and failure to use diligence in making service on a defendant has been held to justify dismissal for want of prosecution. Wright and Miller, supra, § 2370, page 212, footnote 17. Some courts hold that prejudice must be shown. Others hold that prejudice can be presumed from long delay in service; unreasonable delay presumes prejudice.

In this case, there must have been prejudice. American had a genuine stake in the outcome of this case. It was pulled into the case at the last minute, had no opportunity to engage in prompt discovery and to assist local counsel in a search of the law to support a rational interpretation of Rule 3, W.R.C.P., never called to the attention of the trial court, as nearly as we can determine. It seems most peculiar that no one during the district court phase of this case picked up the fact that Rule 3(b) pertains to a *statutory* period of limitations, not a contract period of limitation. Certainly American has a bank of authority interpreting its contract provision for limitation of action against it. We have been presented no such authority.

Even if we were discussing a tolling of the statute of limitations under Rule 3, the prevailing federal rule is that a suit is deemed commenced for purposes of a statute of limitations by the filing of a complaint with the bona fide intent to prosecute the suit diligently, *provided* there was no unreasonable delay in the issuance or service of summons. *Prudential Investment Corp. v. Porcaro*, 1975, 115 R.I. 117, 341 A.2d 720; *Jackson v. Navik*, 1974, 17 Ill.App.3d 672, 308 N.E.2d 143; *Gibraltar Savings Assoc. v. King*, Tex.Civ.App.1971, 474 S.W.2d 758; *Biby v. Smith*, Del.Super. 1970, 272 A.2d 116; *Nauls v. Colby*, Tex.Civ. App.1969, 448 S.W.2d 857; *Linn and Lane*

---

10. See explanation of and reason for Rule 3(b), 12 Wyo.L.J. 202, 206–207.

11. Rule 41(b)(1) and (2), W.R.C.P., in part:
 "(b) *Involuntary Dismissal; Effect thereof.*
 "(1) By Defendant. For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against him. * * *

"(2) By the Court. Upon its own motion the court may dismiss without prejudice any action not prosecuted or brought to trial with due diligence."

12. "Rule 14. Dismissal of Cases.
 "Cases on the docket in which no substantial and bona fide action towards disposition has been taken for six months are subject to dismissal for lack of prosecution."

*Timber Co. v. U. S.*, 1915, 236 U.S. 574, 35 S.Ct. 440, 59 L.Ed. 725; *Murphy v. Citizens Bank of Clovis*, 10th Cir. 1957, 244 F.2d 511; Wright and Miller, supra, § 1056, pp. 178–182 and cases there cited; 54 C.J.S. Limitation of Actions § 266. There is no reason why the same rule of construction cannot be applied to a contract provision for limitation of time in which to "institute" an action.

To institute an action means to "commence" an action. *Accounting Data, Inc. v. McMurtrie*, 1977, 78 Wis.2d 89, 253 N.W.2d 534; *Davis v. Beres*, 1971, 384 Mich. 650, 186 N.W.2d 567; *Wales v. Tax Commission*, 1966, 100 Ariz. 181, 412 P.2d 472. See 21A *Words and Phrases*, "INSTITUTE" and pocket part. We conclude that "institute" and "commence" are synonymous, as are "suit" and "action".

Prior to adoption of the Wyoming Rules of Civil Procedure, § 3–517, W.C.S. 1945 provided that an action was deemed commenced at the date the summons was served on the defendant. Rule 87, W.R.C.P. declared that section superseded. This court has not defined commencement of an action within Rule 3(a), W.R.C.P. but it is apparent that the Federal authority is persuasive. Filing of a complaint is not enough. There must be service within a reasonable time. A period of two and one-half years is not as a matter of law a reasonable time in which to obtain service, under the circumstances of this case, particularly where no excuse whatsoever is offered. We hold that Blair's suit against American was not timely brought under the terms of the performance bond and must be dismissed; we reverse the district court in that regard.

The judgment of the district court is affirmed in part, reversed in part and remanded to the district court for revision of the damages for delay, consistent with this opinion.