WESTATES CONSTRUCTION CO., a
Wyoming corporation,
Appellant (Plaintiff),

v.

The CITY OF CHEYENNE, Laramie
County, Wyoming, and the Cheyenne
Board of Public Utilities, Appellees
(Defendants).

No. 88–191.

Supreme Court of Wyoming.

June 9, 1989.

Rehearing Denied July 12, 1989.

John T. Pappas of Western Law Associates, Lander, for appellant.

Carl L. Lathrop and Peter K. Michael (argued), of Lathrop, Rutledge & Boley, Cheyenne, for appellees.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

CARDINE, Chief Justice.

Appellant Westates Construction Company (Westates) initiated a contract action against the City of Cheyenne and the Cheyenne Board of Public Utilities (City) to recover damages allegedly arising from the performance of extra-contractual work and delays in the construction of the Stage II Water Diversion Project. The district court granted the City's motion for summary judgment on three alternative grounds:

1. Westates' action was barred by its failure to file a timely claim under the Wyoming Governmental Claims Act;

2. Westates effectively relinquished its claims by agreeing to the terms of change orders 3019 and 3032;

3. Westates forfeited its claims by failing to adhere to contractually mandated claims procedures.

We affirm.

Appellant seeks reversal, alleging that the Governmental Claims Act is inapplicable to contract claims and asserting that ambiguities in the contract and the change orders raise issues of material fact which preclude summary judgment. We need not decide whether the Governmental Claims Act and change orders 3019 and 3032 were a bar to appellant's claim because we find that the unambiguous terms of the contract control appellant's right to relief. Appellant's claims are barred because they were not asserted as required by the contract of the parties.

## FACTS

The Stage II Water Diversion Project required the City to obtain an easement from the United States Forest Service (USFS) to increase the storage capacity of Hog Park Reservoir, located in the Medicine Bow National Forest approximately twenty miles southwest of Encampment, Wyoming. Under the terms of the easement issued, USFS retained broad supervisory authority over the project for the control of soil erosion and water pollution. On

July 26, 1982, Westates contracted with the City to enlarge the reservoir. In mid-October, subcontractors began washing gravel and draining muddy water from the process into three holding ponds built by one of Westates' subcontractors. The ponds failed, discharging the muddy pollutant into Hog Park Creek. The USFS, apparently concerned that Westates' diversionary structure might be unable to handle the 1983 spring runoff thereby resulting in a similar degradation of the stream, immediately suspended work until adequate preventative measures could be devised. After evaluating the problem, USFS required Westates to leave the reservoir's existing outlet works in place until after runoff.

Westates alleges in its complaint that compliance with USFS's decision created delays and extensive extra work which so enlarged Westates' contractual obligations as to require additional compensation. During October and November of 1982 Westates requested a change order that would compensate it for the anticipated delays and extra work. The requests, however, were not accompanied by data supporting the claim for additional payment.

About the same time, a dispute arose concerning excavation in the area of the reservoir's new control building and stilling basin. Because the contractors and the project engineers were uncertain whether the excavators had reached bedrock, the area was over-excavated, requiring that it be refilled with concrete. By the end of July 1983, Westates' subcontractor had completed the refilling, and on July 30 representatives for Westates and the City agreed that Westates would be paid for 495 of the 985 cubic yards of concrete required to fill the over-excavation. Thereafter, on November 29, 1983, Westates' subcontractor requested payment for an additional 448 cubic yards of concrete. Westates forwarded that claim to the project engineer with supporting data on March 8, 1984. The engineer denied the claim on May 10, 1984, on the grounds that Westates had already agreed to accept payment for only 495 cubic yards of concrete and had in fact been paid.

In the meantime, because of the USFS's 1982 decision to temporarily leave the reservoir's existing outlet structures in place, Westates had to reschedule the demolition of those structures and postpone construction of the new outlet. Accordingly, Westates fell behind schedule for the 1983 construction season and once again found it necessary to perform additional, but temporary, work to prepare for the upcoming spring runoff. On November 8, 1983, the City authorized change order 3019, relieving Westates of liability for its failure to complete that year's work according to contract deadlines and requiring the completion of certain temporary work in preparation for runoff. By the terms of that change order, Westates was to receive no compensation for the extra work performed or for the delays caused by performing that work. Westates was never able to overcome the delays created in 1982, and the project remained behind schedule. Therefore, on June 4, 1985, the City authorized change order 3032, extending the contract completion date but providing that Westates would receive no extra compensation for work performed during the extension.

On December 19, 1985, Westates submitted a series of claims and supporting data asserting that the City owed it additional compensation for extra work and delays caused by the diversion and excavation problems that arose in 1982. Except for the claim relating to the refilling of the over-excavation, this was the first time that Westates had offered any data in support of its claims. When the City failed to pay these claims, Westates initiated the present action for breach of contract.

## ANALYSIS

Westates' suit was premised on the City's alleged breach of contract. The provisions of the contract control the rights and obligations of the parties. Under the terms contained in §§ 101.10 to 101.12 of the General Conditions of this construction contract, Westates was not entitled to additional payment or an extension of contract

deadlines simply because the City required it to perform extra work. Westates was merely entitled to an "equitable adjustment" of the contract—and then only if it followed the contractually mandated procedures for seeking a change order. If through the use of those procedures Westates successfully obtained an increase in payment or an extension of time, it would have no claim to assert. Thus, under the provisions of Westates' contract with the City, the only type of event which could constitute a breach of the City's obligation to provide additional compensation would be the failure of the contract's dispute resolution mechanisms.

To approach the matter otherwise would be in derogation of the parties' intent to settle their disputes through a more informal and cooperative means than litigation. Such a reading of a public works contract finds support in the dissenting opinion in *Rissler & McMurry Co. v. Wyoming Highway Dept.*, 582 P.2d 583, 586–88 (Wyo. 1978) (Thomas, J., dissenting, with whom Raper, J., joins), and was implicitly adopted by a majority of this court in *Brasel & Sims Construction Co. v. State Highway Commission*, 655 P.2d 265 (Wyo.1982). We noted, in that case, that parties can create a contractual prerequisite to the right to sue such that a claim will not accrue under the contract until the condition has been met. *Id. at 268;* see also *Quin Blair Enterprises, Inc. v. Julien Construction Co.*, 597 P.2d 945, 951–52, 956 (Wyo.1979).

▮ Westates' failure to comply with contractual procedures for submitting its claims clearly and unambiguously deprives it of a right to compensation. As a general principle, parties to a contract have a right to employ whatever provisions they desire so long as those provisions violate neither law nor public policy. *Commercial Union Insurance Co. v. Stamper*, 732 P.2d 534, 538–39 (Wyo.1987). Courts should give effect to the intent of the parties as expressed in the clear and unambiguous language of their contract. *Amoco Production Co. v. Stauffer Chemical Co.*, 612 P.2d 463, 465 (Wyo.1980); *Flora Construc-*

*tion Co. v. Bridger Valley Electric Association, Inc.*, 355 P.2d 884, 885–86 (Wyo. 1960). Thus, where that language is clear, parties can create valid conditions precedent to the right to bring an action, and claims will not accrue under the contract until those conditions have been performed. *Brasel & Sims*, 655 P.2d at 268; *Quin Blair Enterprises*, 597 P.2d at 951–52, 956. Where questions of interpretation or construction arise or where there is a question as to whether a provision is ambiguous, the court may resolve those issues as a matter of law. *Hensley v. Williams*, 726 P.2d 90, 93 (Wyo.1986); *Amoco Production*, 612 P.2d at 467. Therefore, the court may resolve a problem of contract construction by means of a summary judgment unless that contract is facially ambiguous and extrinsic evidence introduced to resolve the ambiguity raises a genuine issue of fact. *Madison v. Marlatt*, 619 P.2d 708, 714 (Wyo.1980).

By the terms of the Agreement Form signed by Westates and the City, "No charge will be made by the Contractor for hindrances or delays from any cause whatsoever in the progress of the work." On its face, that provision seems to preclude any claim by Westates for delay damages. Westates, however, asserts that the provision is rendered ambiguous by a contradictory statement in § 101.12 of the General Conditions of the contract which reads: "The provisions of this Section 101.12, CHANGE OF THE CONTRACT TIME, shall not exclude recovery for damages (including compensation for additional professional services) for delay by either party." We note initially that § 101.03 of the General Conditions provides that the terms of the Agreement shall be given precedence over conflicting terms in the General Conditions. Thus, the Agreement could be said to reasonably limit the General Conditions so as to make delay damages available only to the City.

We need not pursue this argument further, however, because we find that §§ 101.11 and 101.12 of the General Conditions limit Westates' right to compensation for any type of damages, whether that

compensation be an increase in price (§ 101.11) or an extension of time (§ 101.-12). The relevant language of those sections, with the alternative language of § 101.12 in parentheses, is as follows:

"The Contract Price (Time) may only be changed by a Change Order. Any claim for an increase in the Contract Price (extension in the Contract Time) shall be based on written notice delivered to OWNER and ENGINEER within 15 days of the occurrence of the event giving rise to the claim. Notice of the amount (extent) of the claim with supporting data shall be delivered within 45 days of such occurrence unless ENGINEER allows an additional period of time to ascertain accurate cost data (more accurate data). All claims for adjustments in the Contract Price (Time) shall be determined by ENGINEER if OWNER and CONTRACTOR cannot otherwise agree(.) on the amount involved. Any change in the Contract Price (Time) resulting from any such claim shall be incorporated in a Change Order."

We observe that the parties' intent regarding these provisions may be best understood by reference to a portion of § 101.16.01, which states:

"Negotiation shall include all parties to the Agreement—OWNER, CONTRACTOR, and ENGINEER. It shall be used as a means for attempting settlement of disputes and disagreement without the use of outside third party assistance.

\*      \*      \*      \*      \*      \*

"Should negotiation of any dispute or disagreement occur, work shall proceed as scheduled and specified to the completion of the project. All unsettled claims shall be settled by litigation, unless an agreeable settlement can be reached, subsequent to Project Completion.

It is clear from these provisions that the parties entered into this contract with the intent to resolve disputes by informal, prompt, and cooperative means, conducive to the uninterrupted completion of the project. The prospect of litigation over matters which could otherwise be resolved is, therefore, contrary to that intent. A reasonable method of eliminating that prospect would be to condition the right to relief upon the exhaustion of contractual procedures for dispute resolution. Westates has no contractual right to compensation for extra work or delays unless it seeks a change order. Once it initiates that process, Westates acquires a potential right to compensation and a present right to the "equitable adjustment" mandated by § 101.10 of the General Conditions. In order for those rights to accrue, however, Westates must promptly give the City notice of a supportable claim. That condition has not been met.

Westates' suit for breach of contract sought compensation for additional work and delays caused by changes in 1982 with respect to the diversionary and outlet structures. Westates waived its right to compensation for the work and delays associated with the diversionary and outlet structures by failing to submit a timely substantiated claim. At the very latest, the work associated with that claim must have occurred just prior to the issuance of change order 3019 or by November 8, 1983. However, it is uncontested that Westates provided no supporting data for that claim until December 19, 1985, at least two years after the work was performed. Westates, therefore, clearly lost its right to a change order and cannot claim a contractual right to compensation for that work.

Westates also sought compensation for the extra concrete used to refill the excavation under the control house and stilling basin. It similarly lost its right to payment for extra concrete. The record shows that all work associated with that claim had been completed by July 30, 1983, and that Westates' subcontractor had requested payment for that work on November 29, 1983. Though Westates arguably gave timely notice of its claim by a letter to the project engineer, dated December 16 and received on December 19, 1983, no support-

ing data was delivered to the engineer until March 8, 1984. Westates failed to show that the engineer had extended the forty-five day period within which to submit that data. Likewise, it failed to assert that such an extension would have been required to ascertain accurate cost data. Therefore, as with the claims addressed above, Westates failed to raise an issue of fact regarding its failure to comply with §§ 101.11 and 101.12 of the General Conditions of its contract with the City. Summary judgment was appropriate.

Affirmed.