Fitzgerald v. Danaher, No. S0225-04 CnC (Katz, J., July 25, 2005)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT                                        SUPERIOR COURT
Chittenden County, ss.:                              Docket No. S0225-04 CnC


FITZGERALD

v.

DANAHER and XL BUILDING


FINDINGS OF FACT
CONCLUSIONS OF LAW


On the basis of evidence presented at trial July 19–20, 2005, the following decision is announced.

1.      Defendants at all times conducted their business under X-L Building & Design, Inc.  There is no reason to impose personal liability upon either Mr. or Mrs. Danaher.

1

2.      The largest single dispute in this home and barn-building dispute is whether defendant builder contracted to supply a slab for the barn project, as part of the house contract.  The parties envisioned construction of a barn at the time they entered into the house contract.  They provided for a barn frost wall as part of the house contract with the words: "and frost wall for barn with an unexcavated center, and preparation for slab on grade."  The contract also speaks of "barn to be a 4' frost wall only."

These parties made a written contract.  It is the court's obligation to apply that contract, not to rewrite it.  Morrisseau v. Fayette, 164 Vt. 358, 366–67 (1995); H.P. Hood & Sons v. Heins, 124 Vt. 331, 336 (1964).  In so doing, it is our foremost obligation to understand the agreement of the parties, to discern their intent.  New Eng. P'ship, Inc. v. Rutland City Sch. Dist., 173 Vt. 69, 79 (2001).  Any rule of contract interpretation is merely subservient to the purpose of discerning that intent.  11 S. Williston & R. Lord, A Treatise on the Law of Contracts § 30.2, at 22–25 (4th ed. 1999).  Here, we think the plain language of the contract is controlling.  Isbrandtsen v. North Branch Corp., 150 Vt. 575, 579–80 (1988).  It clearly provides for "preparation" for slab, and for "frost wall only."  To somehow interpret this language to mean "supply slab" would be to wholly twist it beyond its clear meaning.  The fact that specification 4 speaks of "slabs" in the plural does not change this result.  It is best understood as referring to any slab which might be provided shall meet the then-stated specifications.

The parties' intention, as revealed by their signed agreement, must be discerned from their agreement as a whole, not from one sentence read in isolation.  John A Russell Corp. v. Bohlig, 170 Vt. 12, 17 (2002).  Viewing the pertinent provisions, we find:
• 		frost wall for barn with an unexcavated center and preparation for slab on grade;
• 		barn to be 4' frost wall only;

2

- all slabs to be 4" thick;
- barn construction to be determined by separate contract.

Fairly read, three of the provisions point to the conclusion that the barn was to be built under a separate contract, but the "frost wall only" is included in this contract, plus preparation for slab. The fourth provision, indicating specifications for a slab is pertinent to both house and barn, but does not by itself indicate a duty to pour a slab for the barn. The only support for plaintiff's position is a single *s* making slab into a plural, and thereby implying a duty to provide more than one slab. Read as a whole, we conclude that an interpretation which assigns more weight to that lone *s* than to "frost wall only" and "preparation for slab" and "separate contract" would be wholly unreasonable. See Colgan v. Agway, 150 Vt. 373, 375 (1988) ("Clarity of language, like ambiguity, is a relative and not an absolute concept.").

The provisions just discussed are from the August 23, 2002 house contract executed by the parties. On October 9 of that year, they executed a barn contract. It contains the same slab specifications, again in the plural, as the house contract. Hence, the parties' later expression manifested an intent that they were, then, contracting for a slab. Parenthetically, the footing and slab provisions are identical in both contracts, even to their typographical errors. At least in terms of understanding the intent of X-L, it shows that this was a standard specification. It does not support a shared understanding of more than one slab. Each contract uses the plural, but each contract clearly intended only one slab to be installed. The later contract shows the ongoing, shared intent of the parties to the earlier. Isbrandtsen, 150 Vt. at 578–79; see also 9A V.S.A. § 2–208 (course of performance and usage of trade); Rutland & B.R. Co. v. Crocker, 29 Vt. 540, 542–43 (C.C.D.Vt. 1857) (two instruments between substantially the same parties made at the same time and constituting the same transaction may explain each other).

3

3. The box sill issue centers on plaintiff's claim that this perimeter house component was left uninsulated. It will be quite a project to rip out the cellar sheetrock; install insulation; and replace, retape and repaint new sheetrock. Based on all the evidence, we are not persuaded that insulation was probably omitted from the finished portion of the basement. It was omitted at least in portions of the mechanical room, but we are not persuaded that it was omitted in the balance. This is a fact that the witnesses' testimony put in dispute.

4. Plaintiff had a circulating hot water pipe freeze during very cold weather. We are persuaded that this resulted from not using the heating system and relying instead on a wood stove in the basement to heat the house. As to whether the hot water system was inadequately insulated, this is a close question. But we are persuaded that good workmanship would provide that joists extending out into a cantilevered porch should probably have been caulked and insulated. It may be that such insulating would prevent intrusion of cold air into the wall and cellar areas adjacent to the problem heating pipes. The reasonable costs of caulking the point where the deck joists pass through the exterior wall to thereby better protect these heating pipes in that limited area is $435. In addition, it appears reasonable to require cutting through a small section of upstairs drywall; insulating the pipe length; and then repairing, retaping, and repainting that small section. Although parties did not offer an estimate of this particular task, through either Meunier or Danaher, based on other evidence presented we find that $225 would have been the reasonable cost to defendant to cure that problem, which was its responsibility. The cutting, insulating, retaping, and repainting, although in a small area, are at the same time similar to tasks being done in other locations for corrections such as nail pops and cracks.

4

5.      Plaintiff has raised an issue about the timeliness of the barn's construction.  It is not clear where this issue takes us, as even if a breach of the time issue is shown, no damages were proved from delayed construction. Carter v. Sherburne Corp., 132 Vt. 88, 92–93 (1974) ("Ordinarily, in contracts where time is not of the essence, a failure to complete the work within the specified time will not terminate the contract, but it will subject the contractor to damages for the delay.").  We understand that plaintiff's animals lost the protection of a barn for a whole winter, but no evidence was presented that she suffered recoverable damages as a result.  See, e.g., Sutton v. Hisaw & Assoc. Gen. Contractors, Inc., 65 S.W.3d 281, 285 (Tex. App. 2001) (breach of contract requires proof of damages).  The barn contract provides "Completion time will be approximately 6-10 weeks from commencement."  Commencement is not defined, but its reasonable meaning would be commencement of construction of the barn.  It could not mean commencement of construction of the house, which had started before the barn contract was even signed. The facts pertinent to understanding and applying this contractual provision are that barn construction, according to this contract, never commenced. Defendant contractor continued to work steadily on plaintiff's house. Plaintiff communicated a pressing need to have the house ready for her occupancy before December 1.  She was, in fact, able to commence residing within it during November in the unusual circumstance of residing within the house while it was being construction.  The parties remained friendly through the end of January, although barn construction never started.  From all these circumstances, together with the meager wording of the contract, we conclude that defendant did not breach the timeliness requirement of its contract—the provision was never triggered because construction never started, with the consent and understanding of plaintiff. Isbrandtsen, 150 Vt. at 578–79 (intent of parties best revealed by all

circumstances surrounding their respective performances).

6.      We are not persuaded that the deck was improperly built because it lacked Sonotube support.  Once the foundation was excavated, ledge was revealed at the site of the deck.  The excavator put gravel atop the ledge, with perhaps one foot separating deck and subsurface ledge.  Ledge does not move with frost.  There is no reasonable need for Sonotubes in such a situation, even though they had been shown in original plans.  Sonotubes only one foot in length are wholly uncommon.  There is no persuasive proof the deck has moved or is improperly supported.

7.      Defendant contractor performed substantial work in plaintiff's cellar, beyond the scope of his contract.  The understanding of the parties was that he would do that work in exchange for a horse owned by plaintiff's friend, Gary Gilmond, which was asserted to be worth $3,500.  He never got the horse.  He is entitled to be paid for the work, according to the agreement reached by these parties.  Their contract was never a "time and materials" agreement.  Of course, we don't know the real, fair market value of the horse and cannot enforce the deal against Gilmond, the horse owner.  But even if the horse's value was exaggerated, plaintiff is in a poor position to argue that she does not owe contractor $2,000 for his work in her basement.

8.      Defendant contractor received $7,000 as a "binder" on the barn contract although he never commenced performance of that contract.  Plaintiff wants the money returned.  Defendant counters that he was ready to commence the barn in January but was delayed from doing so by plaintiff  after it was understood that Gilmond would work on the barn job because she did not want her friend Gilmond working in such cold weather.  There was also credible evidence that Gilmond offered the view that it was

too cold to start the barn project, which may or may not have been related to his personal participation in it.  This was a period in which the parties remained cordial, as shown by their sharing a Super Bowl party.  Defendant delayed starting the work until he realized, probably in March, that their business relationship was over.  In this interval, he could have taken other jobs but turned them down because he felt committed to the barn contract.  As a result, he lost income.

The amount of that lost income is very vague.  The actual test of damages for a corporation such as defendant would be lost profits, not lost income.  Tour Costa Rica v. Country Walkers, Inc., 171 Vt. 116, 124 (2000) ("The purpose of expectation damages is to put the non-breaching party in the same position it would have been [in] had the contract been fully performed.") (citation omitted).  We are persuaded that defendant, an established, successful contractor, did lose profits.  But the amount of any such loss is not shown by the IRS Form 941 Employer's Quarterly Federal Tax Return.  At best, that form merely corroborates that there was probably some loss, because no workers were on payroll for the quarter.  In sum, we are persuaded that defendant lost some profits waiting for the barn go-ahead, which never came.  But we are unable to ascertain what those profits were.

We conclude that the contract provision for a "binder" constitutes something of a liquidated damages provision, which, under all the circumstances is not unfair.  Highgate Assocs., Ltd. v. Merryfield, 157 Vt. 313, 316 (1991).  As an experienced contractor, homebuilder, we would expect defendant to earn a profit of $84,000 per year.  So if he takes $7,000 as damages for one lost month of construction, as he waited for the barn to start, that is reasonable compensation.

9.      Defendant contractor's obligation to complete the contract includes an obligation to complete the punch list. 13 Am. Jur. 2d Building &

Construction Contracts §§ 33, 34; see also Nelson v. Marchland, 691 N.E.2d 1264, 1267 n.1 (Ind. App. 1998) (defining a "punch list"); Quin Blair Ent., Inc. v. Julien Const., 597 P.2d 945, 947 (Wyo. 1979) ("[A] 'punch-list' . . . required the contractor to redo work that was incorrectly or defectively done . . . ."). In this case, that became problematic because a punch list, per se, was not delivered for until months after the contractor had left the site. It came accompanied by an attorney's letter threatening suit. Although there was no actual punch list delivered in a timely manner, defendant still owes some duty to correct the errors which are inevitable in construction of a new home.

But the duty to correct punch list items, when contractor is still mobilized on site, with its own labor, does not equate to a duty to pay retail prices to have different trades come on to the site to do one or another repair. See Sid Grinker Co. v. Craighead, 146 N.W.2d 478, 481 (Wis. 1966) (homeowner not entitled to cost of completion award that exceeded the quality of the original contract); see also 13 Am. Jur. 2d Building & Construction Contracts § 78, at n. 5; D. Dobbs, Law of Remedies § 12.21 (1973). The fact that it is now more expensive for the various, mostly minor punch list items to be corrected should not render defendant contractor liable for a greater amount of damages.

10.     Minor punch list items include:
- Several pieces of vinyl siding had an unsightly ripple, as a result of expansion after the weather warmed, the siding having been nailed in cold weather. Had the contractor been permitted to fix it, it could probably have been done without incurring additional material costs, but would have cost him: $200 (in labor);
- A floodlight was broken, required fixing. Probably a $10 item;
- Upstairs door to balcony needed replacement, as it swung the wrong way. Contractor secured the replacement door, but was denied

8

permission to install replacement because plaintiff did not want door removed for several hours during January cold. Why should contractor have to pay someone else retail prices to replace door, when he could have done it himself? Had he done so, his labor cost would have been: $180;

- Weather stripping around front door probably damaged during construction. Another small item, probably: $50 (including labor);
- Insulation above the bathroom apparently defective as a gap appears when view through lighting "can." Had contractor been told of the problem, and confirmed it, himself, he would have secured the insulation subcontractor to remedy the problem without cost. For not having been given that opportunity, why should he have to pay any damages?
- Attic access through closet: $30;
- Guest bathroom vanity must be moved, several hours work. Had he done it with his assistant it would have cost him probably: $200;
- Cleaning up grout and polyurethane in bathroom, redoing grout. Again cheaper for contractor to do it himself: $200;
- Adjusting bathroom door to meet catch: $10;
- Window sill in living room replaced, finished: $80;
- Faucet handles on whirlpool tub probably require reversing one cartridge, which could be figured out by an experienced carpenter, without need to call a plumber: $30;
- Miscellaneous drywall repairs (nail "pops" and cracks): $150;
- Complete painting of exterior trim: $200.

Total miscellaneous credit to plaintiff homeowner: $1,340.

9

## SUMMARY

On the basis of the foregoing findings, law, and reasoning, we reject the claim that defendant is responsible for the barn slab or for delay in the barn project; we reject plaintiff's claim for return of the $7,000 barn binder. We hold that plaintiff is entitled to recover from defendant contractor $1,340 for miscellaneous punch list items; $435 for insulating deck joist pass-through area; and $225 for insulating heating pipes in area where they have been prone to freezing. We hold that defendant is entitled to recover $2,000 from plaintiff for the value of his labor in finishing her basement. All other claims dismissed.

Dated at Burlington, Vermont, _____, 2005.

_____
Judge

10