RENDERED: DECEMBER 13, 2018
TO BE PUBLISHED



# Supreme Court of Kentucky

## 2017-SC-000274-DG

LOUISVILLE AND JEFFERSON COUNTY
METROPOLITAN SEWER DISTRICT

APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.      CASE NOS. 2015-CA-000333 AND 2015-CA-000374
JEFFERSON CIRCUIT COURT NO. 12-CI-006235

T+C CONTRACTING, INC.

APPELLEE

## OPINION OF THE COURT BY CHIEF JUSTICE MINTON

## <u>AFFIRMING IN PART, REVERSING IN PART AND REMANDING</u>

The Kentucky Fairness in Construction Act ("KFCA"),[1] which became effective over a decade ago, made dramatic changes in our existing law by voiding, as a matter of public policy, a host of what were then customary provisions in construction contracts. On discretionary review of this case, we hold that the Court of Appeals erred when it applied provisions of the KFCA to void the entire dispute-resolution process contained in the parties' sewer-construction contract. The KFCA nullifies contract provisions that prohibit the parties from asserting preserved claims to a neutral third-party adjudicator, but it does not nullify claim-preservation requirements in a contract. And the Court of Appeals further erred by failing to apply the applicable severability

---

[1] Kentucky Revised Statutes ("KRS") 371.400 et seq.

provisions of the KFCA that nullify only the nonconforming contract provisions, leaving the remaining provisions intact. Accordingly, we reverse the decision of the Court of Appeals on this point and reinstate the summary judgment entered in the trial court. We affirm the Court of Appeals on all remaining issues.

## I. BACKGROUND.

The Louisville and Jefferson County Metropolitan Sewer District ("MSD") hired T+C Contracting, Inc. ("T+C") for its Board Run Interceptor, a sewer project in southeast Louisville, for approximately $2.3 million. The contract governing the parties' relationship consists of 20 pages of detailed terms, including the timeframe for performance, the process for dispute resolution (referred to as "Article 13"), and liquidated damages for delayed completion. As provided in the contract, T+C began work on February 1, 2011. T+C was supposed to substantially complete the project by January 31, 2012, but that did not happen.

## II. ANALYSIS.

Before this Court for resolution are three issues: (1) whether the trial court correctly awarded summary judgment to MSD on one of T+C's claims for extra work, (2) whether the trial court properly handled MSD's liquidated damages claim, and (3) whether the trial court properly denied MSD's motions for directed verdict and judgment notwithstanding the verdict ("JNOV") on one of MSD's breach of contract claims against T+C. We address each issue and their subparts in turn.

2

**A. The trial court properly granted summary judgment in favor of MSD on T+C's claim for extra work undertaken to repair and replace damaged pipes associated with the project.**

MSD first challenges the Court of Appeals' reversal of the trial court's grant of summary judgment in favor of MSD, clearing MSD of any liability on T+C's claim for costs incurred in repairing and replacing piping used in the construction of the project. A trial court may grant summary judgment only if the evidence before it "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[2] "Appellate review of a summary judgment involves only legal questions and a determination of whether a disputed material issue of fact exists. So we operate under a de novo standard of review with no need to defer to the trial court's decision."[3]

### 1. *Factual and Procedural Background.*

Under the contract, T+C agreed to install more than 9,400 linear feet of sewer pipe. In early 2012, T+C advised MSD that it had completed work on the project and requested that MSD declare the project substantially complete. On March 5, 2012, MSD notified T+C that it had inspected the pipe system and had discovered leaks. Because of the leaks, MSD refused to declare the project substantially complete. On March 16, T+C notified MSD that the known leaks had been repaired and again requested that MSD declare the project to be substantially complete. On March 22, an MSD representative removed a

---

[2] Kentucky Rules of Civil Procedure ("CR") 56.03.

[3] *Shelton v. Kentucky Easter Seals Soc'y., Inc.,* 413 S.W.3d 901, 905 (Ky. 2013) (internal citations omitted).

manhole cover and saw water in the pipe invert. On April 2, MSD responded to the March 16 letter, stating that it had not accepted the piping and refused to declare the project substantially complete.

Before T+C began further repairs, T+C notified MSD in a letter dated June 6, 2012: "If MSD continues to require that T+C Contracting perform work outside the scope of its contract, T+C Contracting will require that a change order be issued for an equitable adjustment to the contract." MSD responded to T+C's notification in a letter dated June 14, 2012, by inquiring, in part, about whether T+C would perform further work on the project. T+C responded in a letter dated June 15, 2012: "T+C is not refusing to perform any further work . . . . If the work you identify is beyond the scope of our contract, we will submit a proper change order request for that work."

Beginning on June 27, 2012, T+C conducted exfiltration testing to locate the remaining leaks. On July 11, 2012, T+C sent the following email to MSD, claiming that the failure of the pipes was due to a design defect in the pipes that MSD mandated T+C use:

> We again state that this exfiltration testing and repairs are being done under protest since the line had previously passed air testing as required by the specifications. T+C will submit a change order request for an equitable adjustment to the contract price and the contract time as the result of the duplicative testing and the work required as the result of the design deficiency.[4] However, we are proceeding in good faith in an attempt to get this line open for accepting sewer flow.

---

[4] An internal MSD memo, the evidentiary admissibility of which is disputed, indicates that around this time MSD reevaluated the type of pipe it uses under creek crossings. The memo indicates that the type of pipe MSD required in such areas failed in both the Broad Run and River Road Interceptors Projects.

The testing revealed cracks, which allowed groundwater to infiltrate the pipes under four creek crossings. T+C repaired the pipe at three of the four locations, having to replace the pipe at the fourth location because it was beyond repair, incurring additional costs for labor, materials, and equipment.

Before replacing the pipe at the fourth location, T+C retained independent consultants to observe its work and inspect the cracked pipe and concrete encasement as they were removed. The consultants could not determine what generated the large lateral forces that would have caused the cracks in the concrete pipe and encasement, but they indicated that they were not caused by an installation failure on the part of T+C.

On August 24, 2012, MSD certified in writing that substantial completion was achieved on August 17, 2012. On September 7, 2012, T+C reaffirmed that it intended to file a claim for the costs of the repairs and replacement of the pipes, pending a determination of those costs. On October 16, 2012, T+C submitted a claim for $108,542.41 incurred because of additional testing and the repair and replacement of the cracked concrete pipe and encasements that failed for reasons beyond its control. MSD denied this claim, citing T+C's alleged failure to comply with the contract's dispute-resolution process, Article 13. T+C then requested submission of its claim to MSD senior representatives for executive negotiations under Article 13, but MSD did not respond.

T+C to filed suit against MSD. Among other claims, T+C alleged breach of contract for MSD's failure to pay the $108,542.41 for the work it performed to test, repair, and replace the concrete pipes. MSD responded and disputed

T+C's claims and specifically alleged as a defense that T+C failed to comply timely and completely with Article 13, purportedly leading to the waiver of T+C's $108,542.41 claim against MSD.

MSD moved for partial summary judgment on this claim. It asserted that T+C's claim for costs related to repairs or replacement of the creek-crossing pipes was barred by Article 13. Specifically, MSD pointed to T+C's failure to comply with the contract's timeframe and procedures for bringing claims for additional compensation. Because T+C did not comply with Article 13, specifically because T+C did not timely file a formal claim, MSD argued, under the explicit language of the contract, that T+C's $108,542.41 claim was waived. T+C responded by asserting that Article 13 was unconscionable and impossible to comply with, in addition to violating the recently enacted KFCA.

The trial court granted summary judgment in favor of MSD on T+C's claim. The trial court found that T+C's claim was barred because the company failed to comply with Article 13, which required T+C to give written notice of the creek-crossing problem within ten days of discovering it and a formal claim within 30 days of the written notice. The trial court observed that T+C gave MSD timely written notice but failed to file its formal claim within the 30-day period. Instead, T+C tried to file its claim 95 days after its written notice and 60 days after the last pipe was placed. Because Article 13 prescribed strict timeframes, the trial court concluded that T+C's claim was barred. In reaching that conclusion, the trial court rejected T+C's argument that Article 13 was void and unenforceable. The trial court reasoned that T+C and MSD were sophisticated, experienced entities; therefore, the contract was not

6

unconscionable. The trial court also rejected T+C's KFCA argument, finding Article 13 to be a form of alternative dispute resolution allowed under the KFCA.

The Court of Appeals reversed the trial court's summary judgment, holding instead that the KFCA rendered the entirety of Article 13 null and void. The Court of Appeals quoted KRS 371.405(2)(a), which makes void and unenforceable:

> A provision that purports to waive, release, or extinguish the right to resolve disputes through litigation in court or substantive or procedural rights in connection with such litigation, except that a contract may require binding arbitration as a substitute for litigation or require nonbinding alternative dispute resolution as a prerequisite to litigation[.]

Applying this statutory language to the contract, the Court of Appeals declared the entirety of Article 13 void and unenforceable. The Court of Appeals reasoned that the portion of Article 13 that declared appeals to the Chief Engineer to be final and binding ran afoul of the statute. The Court of Appeals also found that the provision declaring unappealed MSD decisions final and binding violated the KFCA. Based on these contract terms, the Court of Appeals deemed the whole of Article 13 void and unenforceable.

### 2. *The KFCA and Article 13.*

The KFCA "legislates several areas of the contractor-owner relationship including: timing of progress payments, limits on retainage, no-damages-for-delay clauses, dispute resolution, mechanic's liens, and attorneys' fees."[5]

---

[5] Neal J. Sweeney, et al., *Kentucky Fairness in Construction Act*, Construction L. Update § 7.05 (2018).

7

Signed into law in 2007, the KFCA "was intended to help level the playing field between contractors and owners."[6]

KRS 371.405 provides, in relevant part, the following:

(2) The following provisions in a contract for construction shall be against the public policy of this Commonwealth and shall be void and unenforceable:

(a) A provision that purports to waive, release, or extinguish the right to resolve disputes through litigation in court or substantive or procedural rights in connection with such litigation, except that a contract may require binding arbitration as a substitute for litigation or require nonbinding alternative dispute resolution as a prerequisite to litigation;

. . .

(c) A provision that purports to waive, release, or extinguish the right of a contractor or subcontractor to recover costs, additional time, or damages, or obtain an equitable adjustment of the contract, for delays in performing the contract that are, in whole or part, within the control of the contracting entity. . . .

(3) Subsection (2)(c) of this section shall not render null, void, and unenforceable a contract provision that:

. . .

(b) Requires notice of any delay by the party affected by the delay; or

. . .

(d) Provides for arbitration or any other procedure designed to resolve contract disputes[.]

. . .

(4) If a provision of a construction contract is found to be null and unenforceable, that provision shall not affect other provisions of

---

[6] *Id.*

8

the contract that are in compliance with this section and, to this end, the provisions of the contract are severable.

The Court of Appeals applied certain portions of the KFCA to render null and void the entirety of Article 13. And the Court of Appeals appears to have overlooked KRS 371.405(4), which, as outlined above, provides for the severability of contract provisions that are not in conformance with the KFCA. Specifically, the Court of Appeals found Subsections (O) and (S) of Article 13 to be in violation of KRS 371.405(2)(a). But, as MSD correctly points out, the Court of Appeals improperly struck all of Article 13 based on the nonconformance of Subsections (O) and (S) with the KFCA, failing to apply the severability requirement outlined by KRS 371.405(4).

"It was early decided that when some covenants of an indenture are legal and others illegal, the legal covenants may be enforced. A court may sever the illegal portion of the agreement and enforce the remainder."[7] "The general and well-established rule of the law of contracts [is] that where an agreement is illegal in part, the part which is good may be enforced, provided it can be separate, or severable, from the part which is bad[.]"[8] Kentucky law recognizes this rule: "Where a contract . . . consists of several covenants and agreements with regard to different subjects, and one of the covenants is illegal and vicious, the general rule which prevails is that, if the illegal covenant of the

---

[7] Samuel Williston, *Williston on Contracts*, 8 Williston on Contracts § 19:70, Severability and enforceability, generally (4th ed. May 2018 update) (citing, among others, *Pigot's Case*, 11 Coke 26b, 1614 WL 1 (U.K. 1614)).

[8] Eugene McQuillin, *The Law of Municipal Corporations*, 10A McQuilling Mun. Corp. § 29:96, Validity generally—Partial invalidity of contract (3d ed. July 2018 updated).

contract can be eliminated from it without impairing its symmetry as a whole, the courts will adopt that view and eliminate the obnoxious feature and enforce the remainder of the contract . . . ."[9] "We, of course, recognize that terms of a contract may be severable in particular items."[10]

Undoubtedly, our rule of severability can be applied, if at all necessary, to invalidate portions of Article 13 that appear to violate the KFCA. We must now determine whether the provisions of Article 13 at issue truly do violate the KFCA. If we find only certain portions to be in violation of the KFCA, we must sever only those portions and not the entirety of Article 13.

Article 13, entitled "Claims by the Contractor and Dispute Resolution," has 22 provisions that outline the terms and conditions to which all claims by T+C against MSD are subject. We provide a brief overview of each of the relevant provisions at issue.[11]

Subsection (A) mandates written notice on the part of T+C for any of its "claims, disputes and other matters in question against MSD." The written notice "shall be received by MSD no later than ten (10) days after the event, or the first appearance of the circumstances[] causing the claim" and must be set forth in detail. Finally, "[T+C] agrees and acknowledges that its failure to

---

[9] *Edleson v. Edleson*, 200 S.W. 625, 629 (Ky. 1918).

[10] *McHargue v. Scott*, 305 S.W.2d 929, 932 (Ky. 1957) (citing *Koppers Co. v. Asher Coal Mining Co.*, 11 S.W.2d 114 (Ky. 1928); *Business Men's Assurance Co. of America v. Eades*, 161 S.W.2d 920 (Ky. 1942)).

[11] MSD's preservation argument on this point is meritless. MSD argues that T+C, over the course of the litigation, only argued that certain provisions within Article 13, not the entirety of the Article, violated the KFCA. But, in its Complaint, T+C alleged that the entirety of Article 13 violates the KFCA.

10

provide written notice of a claim as set forth herein shall constitute a waiver of any claim for additional compensation or time extension related thereto[.]"

Subsection (F) mandates, "[If T+C] seeks to make a claim for an increase in the Contract Price, as a condition precedent to any liability of MSD therefor, [T+C] shall strictly comply with . . . Article 13." Any claim by T+C must be made "before proceeding to execute any additional or changed Work." Finally, "Failure of the condition precedent to occur shall constitute a waiver by [T+C] of any claim for additional compensation."

Subsection (J) mandates that within 30 days after the date of T+C's written notice of claim against MSD, T+C must file a formal written claim against MSD, outlining, in detail, the facts and circumstances of the claim. T+C must also provide MSD with "[o]ther information and documents . . . within ten (10) days after written request by MSD." Finally, "The failure to provide a claim as set forth herein, or the failure to provide such other documents or information requested by MSD within ten (10) days after the written request shall constitute a waiver of any claim for additional compensation or time extension related thereto[.]"

Subsection (K) mandates that MSD "issue a formal written decision on a claim" within 30 days "after receipt of a formal written claim as provided in Paragraph 13(J), or thirty (30) days after [T+C's] response to the request by MSD under said Paragraph for other documents or information, whichever is later[.]" Subsection (L) states that "[t]he issuance of a formal written decision by MSD pursuant to Paragraph 13(K) . . . with respect to any such claim, dispute, or other matter will be a condition precedent to any exercise by [T+C] of such

11

rights and remedies it may otherwise have under the Contract or applicable law in respect of any such claim, dispute, or other matter[.]" If MSD fails to render a formal written decision, T+C may submit to MSD a separate written demand for decision. If MSD later fails to issue a formal written decision within ten days of that separate demand, "the parties shall proceed as if a written decision adverse to [T+C] had been issued."

Subsection (M) mandates, "The formal written decision of MSD on such claim, dispute, or other matter will be final and binding upon [T+C] unless, within ten (10) days after issuance of the decision, [T+C] appeals the decision by delivering to MSD a written request for executive negotiation." Most importantly, if T+C does not appeal the decision by executive negotiation, MSD's decision shall be rendered final and binding. Ten days after the receipt of a request for executive negotiation, the parties must meet and attempt to resolve the dispute. Subsection (N) provides that if executive negotiation fails, T+C may appeal, subject to Subsections (O) through (V).

Subsection (O) mandates that the appeal must be submitted to the Chief Engineer of MSD no later than ten days after the date the executive negotiation has been declared unsuccessful by MSD or T+C. Most importantly, failure to do so within ten days results in the decision of MSD becoming final and binding. The Chief Engineer must issue a decision within 60 days after submission of the request for such decision. If the Chief Engineer fails to issue a written decision within 60 days, "the parties shall proceed as if a written decision adverse to [T+C] had been issued. The decision shall be final, conclusive and binding, absent intentional misconduct, fraud or bad faith[.]"

12

Subsection (S) importantly provides, "MSD and [T+C] agree that all decisions of MSD that are not appealed to the fullest extent provided herein are final, conclusive and binding, and cannot be appealed to or challenged in any forum or court." Furthermore, "MSD and [T+C] further agree that all decisions of the Chief Engineer are final, conclusive and binding . . . and cannot be appealed to or challenged in any forum or court . . . ." Finally, Subsection (V) provides, "[t]he resolution of any claim under Article 13 shall be reflected by a Change Order executed by MSD and [T+C]. Under no circumstances shall MSD or T+C be required to participate in or be bound by any arbitration proceedings."

A careful reading of KRS 371.405 evidences that some, but not all, of the above-highlighted Article 13 provisions run afoul of the KFCA.

The parties appear to be in agreement that Subsection (O) and (S) are rendered null and void under KRS 371.405(2)(a).[12] What the parties disagree on is the effect of this statute on provisions in Article 13, like Subsection (A), which completely bars T+C from asserting a claim against MSD if T+C fails to provide notice of that claim within a certain time period of the occurrence of the events giving rise to that claim. T+C reads KRS 371.405(2)(a) broadly to render null and void Article 13 provisions like Subsection (A). On the other hand, MSD reads KRS 371.405(2)(a) narrowly to preserve Article 13 provisions like Subsection (A). Careful statutory interpretation supports MSD's argument.

---

[12] The Court of Appeals held this to be the case, and MSD does not challenge this finding.

13

To understand why MSD is correct, we must examine KRS 371.405(2)(a), (c), and (3). KRS 371.405(2)(a) renders null and void "[a] provision that purports to waive, release, or extinguish the right to resolve disputes through litigation in court or substantive or procedural rights in connection with such litigation," except the contract may allow for binding arbitration or nonbinding alternative dispute resolution. KRS 371.405(2)(c) renders null and void "[a] provision that purports to waive, release, or extinguish the right of a contractor or subcontractor to recover costs, additional time, or damages, or obtain an equitable adjustment of the contract, for delays in performing the contract that are, in whole or part, within the control of the contracting entity." Finally, KRS 371.405(3) prevents (2)(c) from rendering null and void a contract provision that, in relevant part: 1) requires notice of any delay by the party affected by the delay; or 2) provides for arbitration or any other procedure designed to resolve contract disputes.

There are seemingly two types of provisions in Article 13 at issue: 1) provisions that require the contractor, i.e. T+C, to comply with certain requirements, like providing notice, *in order to preserve its claim*; and 2) provisions that prohibit claims, *even those that are preserved*, from eventually being resolved by a third-party adjudicator. A careful reading of KRS 371.405 proves that the KFCA establishes and treats differently these two categories of contract provisions as well. Simply put, KRS 371.405(2)(a) renders null and void those provisions in the second category identified above but not the first.

If, as T+C argues, KRS 371.405(2)(a) is meant to be read so broadly so as to render null and void any provision that requires T+C to act in some way to

14

*preserve its claim* against MSD, then KRS 371.405(2)(c) is rendered completely superfluous[13] because this is exactly what (2)(c) does in the context of damages and contractual modifications related to "delays in performing the contract . . . within the control of the contracting entity[.]" Rather, (2)(a) only renders null and void those provisions that prohibit a contractor from asserting *preserved claims* before a neutral adjudicator. Adopting T+C's reading would also render KRS 371.405(3) meaningless because that statute provides for acceptable contractual provisions that are not rendered null and void by (2)(c) *and that deal with preservation of the contractor's claim.* In other words, T+C's reading of subsection (2)(a) would also render subsection (3) meaningless because, while (3) saves some types of provisions prohibited by (2)(c), (3) would still leave unsaved those same types of prohibited provisions under (2)(a).

KRS 371.405(2)(a) does not render null and void provisions that force the contractor to undertake some action to *preserve* its claim. For example, Subsection (A), which mandates notice by the contractor of a claim it seeks to assert against the project owner on penalty of waiving that claim, would not be rendered null and void by (2)(a) because that contractual provision deals with *preservation of a claim.* In other words, the contractor can assert a claim against whomever he or she wants but must provide notice to that entity to do

---

[13] *See Shawnee Telecom Res., Inc. v. Brown,* 354 S.W.3d 542, 551 (Ky. 2011) ("We presume that the General Assembly intended for the statute to be construed as a whole, for all of its parts to have meaning, and for it to harmonize with related statutes."); *DeStock No. 14, Inc. v. Logsdon,* 993 S.W.2d 952, 957 (Ky. 1999) ("Any apparent conflict between sections of the same statute should be harmonized if possible so as to give effect to both; and, in so doing, the statute should be construed so that no part of it is meaningless or ineffectual.").

15

so. But Subsections (O) and (S) do not provide a way for the contractor to continue the dispute through a neutral adjudicator; rather, the only function of Subsections (O) and (S) is to take the dispute resolution process out of the hands of a neutral adjudicator altogether. Contractual provisions, like Subsection (A), that afford the contractor the opportunity to continue asserting a dispute before a neutral adjudicator, so long as certain preservation requirements are complied with, do not run afoul of KRS 371.405(2)(a).

Such provisions do, on the other hand, run afoul of KRS 371.405(2)(c). A careful reading of KRS 371.405(2)(a) reveals that (2)(a) does not strike down provisions that simply require the contractor to act to preserve the right to continue the claim. KRS 371.405(2)(c), on the other hand, is much clearer in the extent of its reach, rendering null and void "[a] provision that purports to waive, release, or extinguish the right of a contractor . . . to recover costs, additional time, or damages, or obtain an equitable adjustment of the contract, for delays in performing the contract that are . . . within the control of the contracting entity." Under this provision, contractual provisions like Subsection (A) would be rendered null and void because the failure to comply with them completely forecloses the contractor from asserting a claim against the project owner "to recover costs, additional time, or damages, or obtain an equitable adjustment of the contract, for delays in performing the contract that are . . . within the control of the contracting entity." Under T+C's reading of (2)(a), however, (2)(c) is unnecessary because (2)(a) already has this preclusive effect.

16

KRS 371.405(2)(a) must have a different effect than KRS 371.405(2)(c); otherwise, KRS 371.405(2)(c) is rendered completely superfluous. Simply put, KRS 371.405(2)(c) prohibits contractual provisions that *completely foreclose* a contractor's ability "to recover costs, additional time, or damages, or obtain an equitable adjustment of the contract, for delays in performing the contract that are . . . within the control of the contracting entity," while KRS 371.405(2)(a) prohibits contractual provisions that foreclose the contractor from bringing a claim against the project owner to a neutral, third-party adjudicator *as long as a preserved "dispute" exists*, i.e. the contractor complied with all contractual provisions to ensure that the claim was not waived.

Finally, we cannot forget the effect of KRS 371.405(3). KRS 371.405(3) prevents KRS 371.405(2)(c) from rendering null and void certain contractual provisions that require compliance on penalty of foreclosing the ability of the contractor to recover damages for delays in performing the contract for which the project owner is responsible. Coincidentally, although KRS 371.405(2)(c) would initially render null and void a provision like Subsection (A) of Article 13, KRS 371.405(3) acts as an exception to (2)(c). Subsection (3) specifically affords enforceability of "a contract provision that[] [r]equires notice of any delay by the party affected by the delay[,]" exactly the function of Subsection (A).

KRS 371.405(3) tempers the broad preclusive effect of KRS 371.405(2)(c). Of additional note is KRS 371.405(3)(d), which upholds the enforceability of provisions subject to (2)(c) that "[p]rovide[] for arbitration or any other procedure designed to resolve contract disputes." One could argue that the process outlined in the contract at issue in this case, where the ultimate

17

adjudicator is an MSD official whose decision cannot be appealed, constitutes "any other procedure designed to resolve contract disputes."

But to prevent an absurd result,[14] in conjunction with the statutory canon *ejusdem generis*, we must interpret this provision as providing for "any other procedure designed to resolve contract disputes" *where ultimately a neutral, third-party adjudicator decides the propriety of the claim.* It would be absurd to read (3)(d) as allowing for a contract provision that forecloses ultimate adjudication of a preserved claim by a neutral adjudicator when (2)(a) does exactly the opposite, i.e. negates such provisions. Moreover, the statutory canon *ejusdem generis*, counsels: "Where general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."[15] In (3)(d), the word "arbitration" precedes "any other procedure designed to resolve contract disputes." Using the canon *ejusdem generis*, it would appear that "any other procedure designed to resolve contract disputes" was meant to encompass *neutral, third-party adjudication*, not simply a unilateral adjudication by one of the interested parties. It would be an untenable reading of (3)(d) to afford enforceability of the dispute-resolution process outlined in Article 13, which allows MSD ultimately to dictate the

---

[14] *See Wesley v. Bd. of Ed.*, 403 S.W.2d 28, 30 (Ky. 1966) ("We have often said that statutes will not be given a strict or literal reading where to do so would lead to an absurd or unreasonable conclusion.").

[15] *Yates v. U.S.*, 135 S.Ct. 1074, 1086 (2015) (quoting *Washington State Dep't. of Social & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003)).

resolution of T+C's preserved claims without ultimate resolution by a third-party neutral adjudicator.

Furthermore, recall that (3) upholds the validity of provisions that run afoul of (2)(c). Provisions that run afoul of (2)(c) are those that prevent a contractor from asserting claims against the project owner for delays in performing the contract *"within the control of the contracting entity,"* i.e. project owner. So essentially, if we read (3)(d) as allowing the project owner to create a dispute-resolution system whereby the project owner is the judge, jury, and executioner, then we would be allowing project owners to insulate themselves from damages created by their own actions. This could not have been the intention of the General Assembly in enacting this statute.

In sum, KRS 371.405 works like this. Subsection (2)(a) nullifies contract provisions that prohibit parties from asserting *preserved claims* before a neutral, third-party adjudicator. Subsection (2)(c) nullifies contract provisions that prohibit parties from asserting *unpreserved claims*, subject to Subsection (3)'s exceptions allowing for certain provisions that do that very thing.

Further support for our interpretation of the inner workings of KRS 371.405 can be found in Bruner and O'Connor's seminal treatise on Construction Law.[16] Bruner and O'Connor recognize that "[t]imely notice of claims is a matter of fundamental fairness, and the notice requirements imposed by contracts . . . often reinforce the importance of timely notice by

---

[16] Philip L. Bruner and Patrick J. O'Connor, Jr., 1A Bruner & O'Connor Construction Law §§ 4:35 and 4:36 (June 2018 update).

19

making it a 'condition precedent' to claim recovery or to commencement of litigation."[17] More importantly, "[e]xpress 'condition precedent' provisions . . . routinely are enforced, absent evidence of bad faith, fraud or gross negligence."[18] Moreover, "[i]n addition to claim notice requirements, changes and claims clauses frequently impose time limits for submission of claims themselves within stated time periods following claim notice. . . . Where clear and unambiguous, and not waived by agreement or conduct, such requirements are enforced."[19]

A review of Bruner and O'Connor's guidance on notice-of-claim and claim-submission procedures as procedural bars to filing suit reveals the ubiquity of such provisions in the world of construction law. Indeed, such provisions can be found in the American Institute of Architects' "General Conditions of the Contract for Construction" sample project-owner and contractor contract:

> The [project owner] may order minor changes in the Work that are consistent with the intent of the Contract Documents and do not involve an adjustment in the Contract Sum or an extension of the Contract Time. The [project owner's] order for minor changes shall

---

[17] *Id.* at § 4:35 (internal citations omitted).

[18] *Id.* (citing *A.H.A. General Const., Inc. v. New York City Hous. Auth.*, 699 N.E.2d 368 (N.Y. 1998) (holding that the contract notice and reporting requirements were "conditions precedent to suit or recovery" that could not be modified by extrinsic evidence absent fraud, bad faith or grossly negligent conduct, and that "such provisions are important both to the public treasury and to the integrity of the bidding process")); *see also Bruno v. Whipple*, 130 A.3d 899 (Conn. 2015) (barring a builder's claim against a homeowner for additional compensation where the builder had failed to comply with contract requirements that it bill for work performed every two weeks and to notify the owner of any changes or claims).

[19] Bruner and O'Connor, *supra* fn 16 at § 4:36; *see Westates Const. Co. v. City of Cheyenne*, 775 P.2d 502, 505 (Wyo. 1989) (denying contractor's claim for failing to comply with claim-submission requirement); *see also PYCA Industries, Inc. v. Harrison Cty. Waste Water Mgmt. Dist.*, 177 F.3d 351 (5th Cir. 1999).

be in writing. If the Contractor believes that the proposed minor change in the Work will affect the Contract Sum or Contract Time, the Contractor shall notify the Architect and shall not proceed to implement the change in the Work. *If the Contractor performs the Work set forth in the [project owner's] order for a minor change without prior notice to the [project owner] that such change will affect the Contract Sum or Contract Time, the Contractor waives any adjustment to the Contract Sum or extension of the Contract Time.*[20]

Tellingly, while other states have enacted different versions of the Fairness in Construction Act,[21] we cannot find any support for T+C's interpretation of KRS 371.405 in the case law of those states, from Bruner and O'Connor, from Sweeney, or from the American Institute of Architects. And while it is undeniable that the General Assembly enacted Kentucky's Fairness in Construction Act to level the playing field between contractor and project owner, we cannot find that the General Assembly intended to upend the world of construction law by voiding basic claim-preservation provisions customarily found in contracts of this sort.

In this case, MSD readily admits that Subsections (O) and (S) of Article 13, which prohibit T+C from ultimately asserting *preserved claims* before a

---

[20] American Institute of Architects, General Conditions of the Contract for Construction, Document A201–2017, available at http://aiad8.prod.acquia-sites.com/sites/default/files/2017–04/A201_2017%20sample%20%28002%29.pdf, (last accessed Nov. 30, 2018).

[21] *See e.g.,* K.S.A. 16-1801, et seq. ("Kansas Fairness in Private Construction Contract Act"). One may assume, as we did, that Kentucky's Fairness in Construction Act is a version of some sort of model act. However, a law review article dispelled this notion: "A new law titled the Kansas Fairness in Private Construction Contract Act came into effect on July 1, 2005 . . . . It is neither a standardized model act nor a duplication of the efforts of another state. Instead, it is an original piece of legislation having its genesis in the efforts of several Kansas subcontractors who sought to provide more tools of ensuring the payment of amounts due." Christopher F. Burger, *The Fairness in Private Construction Contract Act: Legislative Fairness or Oxymoron?*, 75 J. Kan. B.A. 22 (May 2006). It appears that Kentucky may have duplicated Kansas's enactment of the Act.

neutral, third-party adjudicator, are null and void under KRS 371.405(2)(a). But MSD asserts that T+C did not comply with the claim-preservation provisions of Article 13 that, if not complied with, waive T+C's purported claim against MSD as unpreserved.

T+C responds to this argument threefold. First, T+C argues that the entirety of Article 13 violates the KFCA, including the claim-preservation provisions. As we have already explained, T+C misinterprets the extent of KRS 371.405(2)(a)'s application. While a broad reading of the plain language of that subsection, standing alone, may support T+C's reading, the language of that subsection read in context with the entirety of the statute cannot. As explained above, it would be an untenable extension of the reach of the KFCA if we gave Subsection (2)(a) the broad interpretation that T+C espouses.

Second, T+C seemingly applies an inverse reading of the KFCA that we have applied. In conjunction with T+C's argument that (2)(a) strikes down claim preservation provisions, T+C also argues that KRS 371.405(3)(b)'s exception allowing for notice-of-claim provisions does not apply in this case. T+C's point is that KRS 371.405(2)(c) and (3) only apply in conjunction with "delay" claims asserted by the contractor against the project owner. However, this entire argument is a misinterpretation of the KFCA.

To accept T+C's argument, one must begin with T+C's premise that KRS 371.405(2)(a) broadly applies to prohibit notice-of-claim provisions. As previously explained, this is an untenable reading of the statute that nullifies contractual provisions commonplace in the construction industry, something

22

that we cannot believe the General Assembly intended to do. Moreover, such a reading renders Subsections (2)(c) and (3) superfluous and without meaning.

T+C has essentially argued the inverse of how the KFCA should be read. Rather than read Subsection (2)(a) narrowly and (2)(c) broadly as we have, T+C reads Subsection (2)(a) broadly and (2)(c) narrowly. In other words, we read the KFCA as: 1) as allowing for claim preservation provisions generally, i.e., (2)(a); 2) then nullifying them in a specific situation, i.e., (2)(c); 3) then allowing for them in even more specific situations, i.e., (3)(b). T+C reads the KFCA as: 1) prohibiting claim preservation provisions generally, i.e., (2)(a); 2) then allowing for them in assertions of "delay" claims only, i.e., (3)(b). As one can see, T+C's reading of the KFCA fails to even consider (2)(c), which, when one does, one discerns that T+C's reading of the KFCA renders that provision meaningless.

Finally, T+C makes a factual argument that it did, in fact, comply with Article 13's claim-preservation provisions. But the correspondence it relies on to prove this fact does not, in fact, prove this fact.

The specific Article 13 provisions at issue here are Subsections (A), (F) and (J). Subsection (A) states:

> All CONTRACTOR claims, disputes and other matters in question against MSD arising out of or related to the Contract or the breach thereof, specifically including without limitation claims in respect to changes in the Contract Price or Contract Time, shall be initiated by a written notice of claim submitted to MSD. *Such written notice of claim shall be received by MSD no later than ten (10) days after the event, or the first appearance of the circumstances, causing the claim, and same shall set forth in detail all known facts and circumstances supporting the claim including the specific amount claimed. The CONTRACTOR agrees and acknowledges that its failure to provide written notice of a claim as set forth herein shall constitute a waiver of any claim for additional compensation or time extension related thereto*[.]

23

Subsection (F) states:

> *In the event the CONTRACTOR seeks to make a claim for an increase in the Contract Price, as a condition precedent to any liability of MSD therefor, the CONTRACTOR shall strictly comply with the requirements of this Article 13 and such claim shall be made by the CONTRACTOR before proceeding to execute any additional or changed Work. Failure of the condition precedent to occur shall constitute a waiver by the CONTRACTOR of any claim for additional compensation[.]*

Subsection (J) states:

> *No later than thirty (30) days after the date of the written notice of claim, the CONTRACTOR shall submit a formal written claim which shall include at least the following information:* (1) a concise statement of the occurrence supporting the claim, dispute or other matter, and the relief sought; (2) identification of the facts giving rise to the claim, dispute or other matter; (3) the date the party discovered the occurrence(s); (4) a detailed schedule of values identifying all costs resulting from the claim, dispute or other matter; (5) documentation supporting the schedule of values; (6) identification of any impact the claim, dispute or other matter has on the critical path schedule; and (7) all correspondence, internal memoranda, progress notes, and other documentation relating to the events which form the basis of the claim, dispute or other matter. Other information or documents shall be submitted to MSD within ten (10) days after written request by MSD. *The failure to provide a claim as set forth herein, or the failure to provide such other documents or information requested by MSD within ten (10) days after the written request shall constitute a waiver of any claim for additional compensation or time extension related thereto[.]*[22]

Applying the statutory interpretation of the KFCA we adopted above, these three subsections of Article 13 constitute preservation provisions, unaffected by KRS 371.405(2)(a).

However, KRS 371.405(2)(c) does apply to initially negate these three subsections because (2)(c) negates provisions preventing the recoverability of

---

[22] (emphasis added).

24

damages *"for delays* in performing the contract that are . . . within the control of the contracting entity." As the Texas Court of Appeals has explained, "delay damages," as contemplated in construction law, have a precise and technical meaning: "Under construction law, . . . [d]elay damages refer to damages 'arising out of delayed completion, suspension, acceleration or disrupted performance'; these damages compensate the contracting party that is injured when a project takes longer than the construction contract specified."[23] "[T]ypical contractor delay damages include the costs associated with increased labor and materials, extended job-site and home-office overhead, laying off and rehiring work crews, loss of efficiency of work crews who have to work around delayed projects, loss of alternative construction job opportunities, or items such as rental equipment, utilities, and site securities."[24]

Here, T+C is making a claim against MSD for the extra cost of the repairing and replacing of the piping—damages that allegedly arose because of MSD's defective pipe design and which, in part, caused delayed completion of the project. But while (2)(c) may initially render null and void Subsections (A), (F), and (J) of Article 13, KRS 371.405(3)(b) and (d) salvage them. Subsection (A) is undoubtedly a notice-of-claim provision allowable under (3)(b). Subsections (F) and (J) could be characterized as notice-of-claim provisions but

---

[23] *Cty. of Galveston v. Triple B Servs., LLP,* 498 S.W.3d 176, 181–82 (Tex. App. 2016) (internal citations omitted) (citing Bruner and O'Connor, *supra* fn 16 at § 15:29; *see also Green Intern., Inc. v. Solis,* 951 S.W.2d 384, 393 (Tex. 1997) (referring to delay damages as "a term of art in the construction industry referring to compensable damage from a delay that could have been avoided by due care")).

[24] Melinda Sarjapur, *Bargaining in the Dark: Why the California Legislature Should Render "No Damage for Delay" Clauses Void as Against Public Policy in All Construction Contracts,* 42 Golden Gate U. L. Rev. 283, 292 (Mar. 2012) (internal citations omitted).

are more properly characterized as claim-filing provisions that fall within the ambit of (3)(d)'s protection of provisions providing for "any other procedure designed to resolve contract disputes." Subsections (F) and (J) begin the dispute-resolution process by requiring T+C to file a formal written claim with MSD. And unlike Subsections (O) and (S), which prohibit neutral third-party adjudication of T+C's claim, these provisions do not deny ultimate resolution by an adjudicator. In other words, if the requirements of Subsections (F) and (J) are complied with, ultimate resolution of T+C's claim by a neutral, third-party adjudicator can still occur, unlike what Subsections (O) and (S) provide for.

Having concluded that Subsections (A), (F), and (J) are valid under the KFCA, we now examine whether T+C complied with them. Between March and April, T+C and MSD corresponded with each other about the leaky pipes. This exchange culminated in MSD's ordering T+C to repair and replace the failed concrete pipe at the creek crossings at T+C's own expense. Before T+C began repairs, T+C stated in a letter to MSD dated June 6, 2012: "If MSD continues to require that T+C Contracting perform work outside the scope of its contract, T+C Contracting will require that a change order be issued for an equitable adjustment to the contract." MSD responded in a letter dated June 14, 2012, to T+C's notification, inquiring as to whether T+C would perform further work on the project. T+C responded in the following way in a letter to MSD dated June 15, 2012, which T+C alleges satisfied the notice-of-claim provisions in Article 13:

> We are going around in circles. We believe the work is substantially complete, and you say it is not and tell us to "perform any further work required on this matter and towards the completion of this project as outlined in the contract." What is that work, because we believe all work is completed? We are working to address the items on your punch list as appropriate, but punch list work is to be performed after substantial completion.
>
> If the work you identify is beyond the scope of our contract, we will submit a proper change order request prior to performing that work.
>
> T+C is not refusing to perform any further work as you incorrectly suggest in your letter. We will look forward to MSD either certifying that the work is substantially complete or advising us of the additional work that MSD believes still needs to be performed. If the work you identify is beyond the scope of our contract, we will submit a proper change order request for that work.

Beginning on June 27, 2012, T+C conducted exfiltration testing to locate the remaining leaks. On July 11, 2012, T+C sent the following email to MSD, which T+C argues is sufficient to comply with the notice-of-claim provisions in Article 13:

> We again state that this exfiltration testing and repairs are being done under protest since the line had previously passed air testing as required by the specifications. T+C will submit a change order request for an equitable adjustment to the contract price and the contract time as the result of the duplicative testing and the work required as the result of the design deficiency. However, we are proceeding in good faith in an attempt to get this line open for accepting sewer flow.

On August 24, 2012, MSD certified in writing that substantial completion was achieved on August 17, 2012. On September 7, 2012, T+C sent correspondence to MSD, stating, in part, the following: "[T+C] notified MSD in July of our position and our *intention* to file a claim for equitable adjustment." Finally, on October 16, 2012, T+C requested an equitable adjustment to the contract for testing and pipe repairs.

27

Admittedly, there are several issues that could conceivably be argued as being issues of material fact that would preclude summary judgment—whether the correspondence sent by T+C to MSD constitutes a "notice of claim" sufficient to satisfy Subsection (A) of Article 13; whether that correspondence complied with the time requirements set out by Subsection (A); etc. However, what cannot be argued as being an issue of material fact, and what resolves all other issues of material fact that would preclude the granting of summary judgment in favor of MSD, is the failure of T+C to file a formal written claim thirty days after filing anything that could be argued as being written notice of a claim. The trial court's ruling was correct in this regard.

T+C argues in its brief that the correspondence it sent to MSD on June 15 and July 11 constitute sufficient written notice to satisfy Subsection (A) of Article 13. Even assuming this to be true, T+C did not file anything purporting to be a formal written claim until October 16, far past the thirty-day window Subsection (J) of Article 13 requires for filing a formal written claim after the filing of a notice of claim. And T+C points to nothing that would support a finding that the preservation requirements of Subsection (J) were satisfied. As such, T+C waived its claim against MSD for the cost of fixing the pipes because it failed to comply with the preservation-of-claim requirements outlined in Subsection (J) of Article 13.

So we reverse the Court of Appeals on this issue and reinstate the order of the trial court granting summary judgment in favor of MSD on T+C's claim for additional work and costs incurred in conjunction with the repair of the piping.

28

### 3. T+C's Arguments on Unconscionability and Impossibility.

Before the trial court, T+C asserted the contract defenses of unconscionability and impossibility to render Article 13 null and void on alternative grounds. The trial court summarily rejected T+C's arguments. On appeal to the Court of Appeals, T+C seemingly abandoned its unconscionability argument but made brief mention of the impossibility of complying with Subsection (J) of Article 13. The Court of Appeals found merit in T+C's Article 13 argument, so it did not reach any purported argument relating to the impossibility defense.

While T+C appears to have waived its unconscionability argument, because it did not assert this argument as the Appellant before the Court of Appeals, T+C did mention its impossibility argument to the Court of Appeals. And although T+C did not mention either contract defense in its brief, because T+C did mention impossibility at oral argument and because it is the Appellee on this issue, we must examine T+C's impossibility defense argument.

The impossibility doctrine is well established in Kentucky law:

> It is a well-settled rule of law that, where the law itself creates a duty, the nonperformance of it will be excused by an unavoidable accident previous to its performance. But this principle has no application to a case where a person has created a charge or obligation upon himself by an express contract. In the latter case he will not be permitted to excuse himself therefrom by pleading an act of God rendering performance impossible. This doctrine has also been repeatedly announced by this court.[25]

---

[25] *Home Ins. Co. v. Wood*, 72 S.W. 15, 16 (Ky. 1903) (internal citations omitted).

"Where the performance becomes impossible subsequent to the making of the contract, the rule is that the promisor is not therefore discharged."[26] "[W]here the party by his own contract creates a duty or charge upon himself, he is bound to make it good, notwithstanding an accident by inevitable necessity, because he might have provided against it by his contract."[27] Furthermore:

> If one for a valid consideration promises another to do that which is in fact impossible, there seems no reason why the promisor should not be held to pay damages for the breach of the contract; not, in fact, for not doing what cannot be done, but for undertaking and promising to do it. So if it becomes impossible by contingencies which should have been foreseen and provided against in the contract, and still more if they might have been prevented, the promisor should be held answerable.[28]

T+C simply makes the conclusory argument that compliance with Subsection (J) of Article 13 is impossible. "The burden of proving the defense of impossibility is on the party asserting it."[29] T+C has not met its burden here because it has not asserted with any specificity or provided any evidence regarding the alleged impossibility of complying with Subsection (J). Even if it had, longstanding Kentucky precedent would preclude T+C from asserting this defense. T+C's impossibility defense is meritless.

### 4. *We must reinstate the summary judgment.*

In conclusion, T+C failed to comply with claim-preservation provisions in Article 13, thereby procedurally barring T+C from asserting its claim in this

---

[26] *Runyan v. Culver*, 181 S.W. 640, 643 (Ky. 1916).

[27] *Id.* (internal citations omitted).

[28] *Id.* (internal citations omitted).

[29] C.T. Foster, *Modern status of the rules regarding impossibility of performance as defense in action for breach of contract*, 84 A.L.R. 2d 12 (originally published in 1962, updated weekly) (internal citations omitted).

regard. No issues of material fact exist that preclude summary judgment against T+C on its claim for damages related to the work it performed and costs incurred fixing the leaky pipes. MSD is entitled to summary judgment as a matter of law. We therefore reverse the Court of Appeals on this issue and reinstate the trial court's grant of summary judgment in favor of MSD on this claim.[30]

## B. The trial court improperly prevented T+C from obtaining discovery on the actual damages suffered by MSD in this case.

MSD argues that the Court of Appeals improperly reversed the trial court's denial of T+C's motion to compel deposition testimony from an MSD official who would purportedly testify concerning the amount of actual damages MSD suffered in this case. We agree with the Court of Appeals.

Article 6 of the contract provides that T+C needed to reach substantial completion of the project on or before January 31, 2012. Article 6 also provides that the failure to reach substantial completion by this date triggers the award of liquidated damages to MSD in the amount of $600 per day.[31]

As stated, substantial completion on the project was not reached until August 17, 2012. This prompted MSD to seek $106,800 in liquidated damages ($600 multiplied by 178 days) from T+C. T+C responded by asserting that the

---

[30] We need not reach the substantive issue of the admissibility of an MSD corporate memo allegedly evidencing MSD's fault regarding the failing pipes because T+C's claim is procedurally barred. For the same reason, we also need not reach the substantive issue of whether MSD's allegedly defective pipe design caused the necessary repairs to the piping T+C made.

[31] There are exceptions to this general provision, but they are irrelevant for purposes of this issue.

liquidated damages asserted were not reasonable approximations of the actual damages MSD allegedly sustained.

As such, T+C served MSD with discovery requests, including an interrogatory inquiring about MSD's actual damages sustained attributable to the failure to timely achieve substantial completion. MSD responded: "Per the contract, since the project is not complete, MSD is in the process of determining their damages from the delay and will supplement in accordance with the rules of civil procedure if and/or when such delay damages can be ascertained." MSD provided no such supplement.

T+C then noticed a discovery deposition of MSD, one of the matters identified in the deposition notice being "[t]he actual damages sustained by MSD as a result of MSD's claim of delay in achieving substantial completion of the . . . project[.]" MSD produced for the deposition two designated representatives but did not produce anyone prepared to testify about the damages question mentioned in the notice. One of the representatives commented, "We will not have anybody here to testify about the actual damages sustained by MSD on this project because we haven't figured the actual damages on this project. . . . We're not claiming actual damages on this project." At one point during the deposition, T+C questioned the representative, "Do you know anything about the actual damages that MSD has suffered as a result of the Broad Run Interceptor Project or delay?" The representative responded, "No. I wasn't there when that was discussed."

In September of 2013, T+C moved the trial court to compel MSD to respond to its discovery requests with respect to the actual damages it suffered

due to the delay in substantial completion. MSD refused to answer these requests, arguing that Kentucky law does not require MSD to provide information about actual damages in a claim for liquidated damages. The trial court, on October 23, 2013, granted T+C's motion to compel discovery and ordered MSD to provide T+C with the information T+C was requesting.

After the trial court's order, T+C sent a follow-up interrogatory to MSD inquiring about its actual damages resulting from a delay in substantial completion. MSD responded:

> MSD objects to this interrogatory as it is unduly burdensome and harassing in design and effect. MSD further objects to this Interrogatory as it seeks to shift T+C's burden upon MSD by demanding that MSD engage in an expensive, onerous, and speculative undertaking that is not mandated by law – i.e., the identification, tracking, calculation, valuation, and aggregation of its actual damages arising from each aspect of T+C's breach. MSD further states it is not making a claim for actual damages as a result of the delay and has not calculated its actual damages resulting from said delay in achieving Substantial Completion, nor is it required by law to undertake such analysis. Thus, no actual damages from the delay have been determined and no person has undertaken to determine them.

One month after serving this response, and four months after the taking of the deposition of the two MSD officials, one of the MSD officials filed an affidavit stating the following:

> MSD has suffered and continues to suffer damages from T+C Contracting, Incorporation's delayed performance in the form of continued supervision and administrative costs associated with overseeing the Board Run Interceptor Project which was scheduled to be completed on or about April 21, 2012,[32] but which only achieved substantial completion on or about August 17, 2012.

---

[32] Although the contract initially specified that substantial completion was to be reached by January 31, 2012, MSD apparently acquiesced to T+C's requests to extend the date of substantial completion to this date. T+C makes no argument, however, that this date affects the liquidated damages amount asserted by MSD.

33

After the filing of this affidavit, MSD refused to appear at another deposition to allow T+C the opportunity to cross-examine the MSD representative on the statements made in the affidavit, and the trial court declined to compel MSD's compliance with T+C's discovery attempts.

T+C then filed a motion for summary judgment, requesting the trial court dismiss MSD's liquidated-damages claim, in part, because of MSD's alleged failure to provide responses to T+C's inquiries about actual damages. The trial court denied T+C's motion.

At the end of the jury trial in this case, when the jury had resolved all factual issues determining whether MSD was entitled to the liquidated damages, the court entered judgment awarding MSD liquidated damages based on the jury's resolution of the factual issues. The Court of Appeals reversed, finding that the trial court abused its discretion in denying T+C's motion to compel the discovery deposition of the MSD representative who filed an affidavit.

We review a trial court's denial of a motion to compel discovery for abuse of discretion.[33] "Under our abuse of discretion standard of review, we will disturb a ruling only upon finding that the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[34]

---

[33] See Inverultra, S.A. v. Wilson, 449 S.W.3d 339, 345 (Ky. 2014).

[34] Commonwealth v. Andrews, 448 S.W.3d 773, 780 (Ky. 2014) (quoting Commonwealth v. English, 993 S.W.2d 941, 945 (Ky. 1999)).

34

In denying T+C's motion to compel, the trial court examined Kentucky law, which led to its assertion that "[i]t is the *fact* that these damages were incurred which invokes the liquidated damages provision, not their *amount*."[35] In other words, because MSD asserted to the trial court that it had suffered actual damages, the exact amount of these damages was unnecessary because the existence of actual damages, in and of itself, is sufficient to afford the award of liquidated damages. The trial court missed the point with this ruling.

As both the trial court and Court of Appeals recognized, the seminal case on the rules of law regarding the propriety of an award of liquidated damages is *Mattingly Bridge Co., v. Holloway & Son Const. Co.*[36] In *Mattingly*, the Court adopted from the Restatement (Second) of Contracts its "expression of the rule applicable to liquidated damages: 'Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.'"[37]

"'Anticipated loss' refers to the time of the making of the contract. 'Actual loss' refers to the circumstances upon occasion of the breach. These are two prongs, which apply alternately. If the award of liquidated damages exceeds any reasonable limitation by either one or the other, to such extent it is

---

[35] (emphasis in original).

[36] 694 S.W.2d 702 (Ky. 1985).

[37] *Id.* at 705 (quoting Restatement (Second) of Contracts § 356(1) (1981)).

unenforceable."[38] The Court then discussed the history of provisions providing for liquidated damages and how they have evolved:

> Historically[,] contract provisions specifying liquidated damages were viewed with disfavor, as devices to extract penalties and forfeitures and against public policy. In time the rule evolved that such devices would be recognized as a useful commercial tool to avoid litigation to determine actual damages. But two restrictions remain: they should be used only (1) where the actual damages sustained from a breach of contract would be very difficult to ascertain *and* (2) where, after the breach occurs, it appears that the amount fixed as liquidated damages is not grossly disproportionate to the damages actually sustained.[39]

The Court then reaffirmed this rule, having been previously stated by this Court: "[W]e have not abandoned the second prong [of the test]. In *Robert F. Simmons & Assoc. v. Urban Renew. & Comm. Dev.*,[40] we restated our basic rule in full: '[T]he agreement will be enforced where the damages are uncertain or difficult of reasonable ascertainment and the amount agreed upon is not greatly disproportionate to the actual injury.'"[41]

To start, the trial court and MSD have misinterpreted *Mattingly*. The trial court and MSD are incorrect when they assert that a liquidated-damages clause is valid and enforceable simply because a party has asserted actual damages. As stated in several different ways in *Mattingly*, the validity and enforceability of a liquidated-damages provision depends, in part, on the actual damages sustained. This is so because, for a liquidated-damages provision to

---

[38] *Mattingly*, 694 S.W.2d at 705.

[39] *Id.* (internal citations omitted) (emphasis in original).

[40] 497 S.W.2d 705, 706 (Ky. 1973).

[41] *Mattingly*, 694 S.W.2d at 705 (internal citations omitted).

be valid, "the amount fixed as liquidated damages [cannot be] grossly disproportionate to the damages actually sustained."[42]

The trial court denied T+C's motion based on an incorrect interpretation of *Mattingly*. No other basis was given for the trial court's order. In other words, the trial court did not provide, and MSD has never articulated, any other reason why this information does not fall within the broad reach of discoverable material under CR 26.02. "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action[.]"[43] "CR 26.02 . . . trends toward discovery. . . . Relevancy 'is more loosely construed upon pre-trial examination than at the trial, and the Rule requires only relevancy to the subject matter involved in the action.'"[44]

Plainly put, MSD and the trial court morphed *Mattingly* into a discovery-precluding device, conflating the liquidated-damages rules espoused in *Mattingly* with the rules of discovery. T+C was entitled to depose MSD's official and ask him about actual damages incurred by MSD on the project, and the trial court abused its discretion in preventing it.

At three different times during the discovery stage, MSD hinted at having, at the very least, discussed actual damages suffered by MSD in this case. First, upon receiving T+C's initial request for discovery relating to MSD's actual damages, MSD responded: "Per the contract, since the project is not

---

[42] *Id.*

[43] CR 26.02(1).

[44] *Richmond Health Facilities-Madison, LP v. Clouse*, 473 S.W.3d 79, 83 (Ky. 2015) (internal citations omitted).

complete, *MSD is in the process of determining their damages from the delay and will supplement in accordance with the rules of civil procedure if and/or when such delay damages can be ascertained.*" Second, at an MSD representative's deposition, T+C asked the representative, "Do you know anything about the actual damages that MSD has suffered as a result of the Broad Run Interceptor Project or delay?" The representative responded, "No. *I wasn't there when that was discussed.*" Finally, an MSD official in an affidavit asserted that MSD suffered certain actual damages "in the form of continued supervision and administrative costs[.]" MSD continues to assert that it does not need to provide any information regarding actual damages by application of *Mattingly* at the same time that it continuously asserts that it has suffered actual damages in addition to alluding to discussions between MSD officials as to the actual damages, if any, suffered in this case.

*Mattingly* cannot be used as a shield to block application of the rules of discovery. MSD cannot use *Mattingly* to avoid turning over to T+C discoverable material, if any, regarding actual damages suffered in this case. The only argument that MSD has made is that the law does not force it to compute actual damages suffered. But MSD misses the point. T+C is not forcing MSD to compute its actual damages; T+C is simply asking for discoverable materials MSD possesses that in any way evidence a computation or estimation of actual damages. Although MSD argues that it "has not calculated actual damages for this project," *MSD does not argue to this Court that it has never gone about estimating or discussing actual damages or has no relevant discoverable material on this matter,* rather, MSD has argued, essentially, that whether it

38

had discussions about or computed or estimated the actual damages suffered in this case is irrelevant because actual damages have no bearing on the assertion of liquidated damages. As highlighted above, such an assertion contravenes the rule in *Mattingly*. Simply put, if MSD has discoverable material regarding actual damages it suffered, it must produce it to T+C.[45]

The trial court abused its discretion when it endorsed the discovery-precluding use of *Mattingly* MSD advocated. MSD has, three separate times, alluded to the fact that it may have discoverable material regarding a computation or estimation of or discussion about actual damages. Neither *Mattingly* nor any other aspect of Kentucky law regarding liquidated damages has anything to do with the ability of T+C to obtain discoverable material. The rule that *Mattingly* does support is that courts must determine whether "the amount fixed as liquidated damages is . . . grossly disproportionate to the damages actually sustained.[46] *Mattingly* is in no way a tool to be used by the trial court to prevent discovery of relevant evidence the trial court could use to make that determination.

It may be possible for a trial court to award liquidated damages to a party because it can ascertain that such damages are not "grossly disproportionate" to the actual damages suffered without knowing the exact amount of those actual damages. If the trial court made that finding in this

---

[45] MSD also argues that the partial discovery it has provided on this matter satisfies any obligation to provide further discovery. But, this has no bearing on MSD's obligation to comply fully with the rules of discovery and the trial court's orders.

[46] *Mattingly*, 694 S.W.2d at 705.

case, we may have upheld its ruling. But that is not what the trial court did here. Rather, the trial court found that simply the existence of actual damages allows the award of liquidated damages. This is not the appropriate finding to be made for an award of liquidated damages under *Mattingly*.

We affirm the Court of Appeals on this issue and remand this case to the trial court to order MSD to comply with T+C's discovery requests and for the trial court to consider the resolution of this issue in light of *Mattingly*, making findings of facts and conclusions of law as such.[47]

## C. The trial court properly denied MSD's motions for directed verdict and JNOV regarding liability associated with the construction and repair of a third-party's pond.

MSD next argues that the trial court should have granted its motions for directed verdict and JNOV regarding MSD's costs incurred in constructing and repairing a third-party's pond that T+C was allegedly obligated to undertake.

MSD obtained an easement for the project from an adjacent land owner, agreeing to rebuild and line the landowner's pond to guard against cracks caused by construction of the project. MSD contracted with T+C to do this work. T+C argued at trial that, through one of its corporate officials, T+C obtained permission from MSD to release T+C of liability associated with the reconstruction and lining of the pond if T+C provided MSD with a written request from the third-party pond owner assenting to this release.

---

[47] We fail to see how the trial court's error can be considered harmless under CR 61.01, considering the trial court never made the findings *Mattingly* required it to make. In fact, as explained, the trial court's opinion is in complete contravention of *Mattingly*.

Three T+C officials testified on this matter. One T+C official stated that the removal of the pond work from the scope of work of the contract was discussed and agreed upon. Another T+C official confirmed the agreement between T+C and MSD to allow T+C's release from the obligation under the contract related to the reconstruction and lining of the pond upon the third-party pond owner's assent. Yet another T+C official was able to point to his notes from a progress meeting between MSD and T+C confirming that the pond matter was discussed. The official could not recall who from MSD was at that meeting. T+C then sought to introduce email communications between the T+C official and the third-party pond owner, purportedly confirming the pond owner's assent to T+C's release from the obligation to rebuild and line the pond. MSD objected to the introduction of this evidence on hearsay grounds, but the trial court allowed admission of the evidence.

The appropriate standard of review of the trial court's denial of a motion for directed verdict and JNOV in a civil case is set forth in *Lewis v. Bledsoe Surface Mining Company*:

> Upon review of the evidence supporting a judgment entered upon a jury verdict, the role of an appellate court is limited to determining whether the trial court erred in failing to grant the motion for directed verdict. All evidence which favors the prevailing party must be taken as true and the reviewing court is not at liberty to determine credibility or the weight which should be given to the evidence, these being functions reserved to the trier of fact. The prevailing party is entitled to all reasonable inferences which may be drawn from the evidence. Upon completion of such an evidentiary review, the appellate court must determine whether the verdict rendered is "'palpably or flagrantly' against the evidence so

41

as 'to indicate that it was reached as a result of passion or prejudice.'"[48]

"In reviewing a trial court's decision to deny a motion for a judgment notwithstanding the verdict, 'we apply the same standard of review that we use when reviewing a lower court's decision to deny a motion for a directed verdict.'"[49]

Before we examine the propriety of the trial court's denial of MSD's motions for directed verdict and JNOV, we must first determine whether we can consider the email communication between the T+C official and the third-party pond owner as evidence that would preclude the granting of these motions in favor of MSD. MSD argues that the trial court erred in admitting the contents of the email communication between the MSD official and the third-party pond owner, specifically, because the contents of the email constitute inadmissible hearsay.

"'Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[50] "Hearsay is not admissible[.]"[51]

More importantly, however, as Professor Lawson explains: "The hearsay rule does not exclude relevant testimony as to what . . . contracting parties said with respect to the making . . . of an . . . agreement. The presence or absence of

---

[48] 798 S.W.2d 459, 461–62 (Ky. 1990) (internal citations omitted).

[49] *Mountain Water Dist. v. Smith*, 314 S.W.3d 312, 316 (Ky. App. 2010) (internal citations omitted).

[50] Kentucky Rules of Evidence ("KRE") 801(c).

[51] KRE 802.

such words and statements themselves are part of the issues of the case."[52] "In a contract action, where a party regularly has to prove the making of an offer, acceptance of that offer, or specific terms of an agreement, the making of a statement is almost always an element of a claim or defense."[53] "In these situations, the statements are sometimes called 'verbal acts' and sometimes 'operative facts,' labels that are used to emphasize that the relevance of such statements does not depend upon the truth of assertions contained therein (and that such statements do not implicate the hearsay rule)."[54] Finally, "[e]vidence of an . . . agreement to modify an original contract, or of a[] . . . waiver of a condition of that contract, is not inadmissible as hearsay, since such evidence is attempted proof of an operative statement not within the hearsay rule."[55]

The email communications between the T+C official and the third-party pond owner are, in relevant part, as follows:

> T+C Official: I wanted to set out the things we had talked about this morning, 8-6-2012, regarding the pond . . . . This will serve as a draft to make sure we get things correct.
>
> We discussed the pond restoration and the suspected leak at the south west end of the pond. We also discussed the overflow at the north end and the constant trickle of water in it throughout July and August of this year. We discussed the pond restoration process; pump out the water, remove the bottom, place new clay material and re-compact it into place, and let the pond fill by rain

---

[52] Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 8.05[2][b] (5th ed. 2013) (quoting *Creaghe v. Iowa Home Mut. Ins. Co.*, 323 F.2d 981, 984 (10th Cir. 1963)).

[53] Lawson, *supra* fn 39.

[54] *Id.* (internal citations omitted).

[55] Francis C. Amendola, et al., 31A C.J.S. Evidence § 462 (Sept. 2018 update) (internal citations omitted).

water and the natural spring. You mentioned that T+C would not need to restore the pond as it had never been disturbed. You would evaluate the need for restoration in one year. You mentioned that you would only bush hog the western bank of the pond twice per year. You asked T+C to maintain the brush on the western bank of the pond to allow you to monitor it more closely. I replied that I would have to get my superior's OK to authorize that. You offered to let T+C use your pastures from the street as access to get in with bush hog equipment. I agreed that if we needed access from the street through your property, we would give notice before arriving on site.

T+C will agree to trim back the saplings and the weeds on the western bank of the pond that borders the construction easement. T+C will agree to provide notice of 24 hours prior to accessing your property from the street should the need arise. T+C will agree to re-evaluate the pond and the need for restoration in one year from today. At that point, if the pond needs no restoration, T+C will be released from the responsibility to trim the weeds along the western bank and the responsibility to perform any restoration to the pond.

Let me know if the summary of the meeting this morning is accurate and if the terms are agreeable.

Third-Party Pond Owner: One clarification: in reference to item 5 below — I shared that typically we use the bush-hog twice per year to the fields in this area of the property — not that I just only did the pond perimeter. Other than that slight change, yes you have captured our discussion and hopefully with getting the brush trimmed back from this area of the pond we can more closely assess if there is actually a leakage from the pond and any need for a full restoration. Thank you for your walk-through with me on this matter.

T+C sought to use the statements highlighted above to show: 1) that the conducting of the correspondence itself evidences MSD's assent to modify the contract to allow T+C to relieve itself of liability for the pond work, as there was purportedly no other purpose for having such correspondence; and 2) an agreement on the part of T+C and the third-party pond owner to release T+C from liability associated with reconstructing the pond. These statements do not

44

constitute inadmissible hearsay, but rather relevant verbal acts, because they evidence the modification of the contract between T+C and MSD and the making of a contract between T+C and the third-party pond owner. The trial court did not err in admitting these statements.

Based on the email communication between T+C and the third-party pond owner, in addition to the testimony of the three T+C officials, we cannot say that the trial court erred in denying MSD's motions for directed verdict and JNOV.[56] The testimony of the three T+C officials and the email communications provide support for the T+C officials' contention that MSD agreed to release T+C from liability for reconstruction and lining of the pond upon the third-party pond owner's assent to it.

Even if we had excluded the email communication from evidence, the entirety of this issue rests on the credibility of the T+C officials. The jury was entitled to believe—or to discount—the T+C officials' testimony that MSD and T+C agreed to relieve T+C of its obligation to restore the third-party's pond. One official was able to provide his notes from a purported meeting held between MSD and T+C, where the parties allegedly discussed this issue. MSD combatted the official's testimony through cross examination and rebuttal testimony. But the jury was entitled to believe the entirety of the T+C officials'

---

[56] MSD also argues that "it is a legal impossibility [that] a stranger to [a] [c]ontract could excuse T+C's duties thereunder owed to MSD alone." This argument fails to recognize that T+C is arguing that MSD agreed to this in a valid modification of the contract. In other words, T+C is not arguing that it relieved itself of the duty to fix the pond by agreement with the pond owner alone; rather, T+C first asserts that MSD agreed to allow T+C to relieve itself from the duty to fix the pond upon agreement from the third-party pond owner.

testimony that MSD agreed to relieve T+C of liability associated with reconstructing the pond and that T+C complied with the necessary conditions, namely, obtaining the third-party pond owner's assent, to do so.

In sum, we cannot say that the jury's verdict was "'palpably or flagrantly' against the evidence so as 'to indicate that it was reached as a result of passion or prejudice.'"[57] So we affirm the Court of Appeals on this issue.

## III.   CONCLUSION.

For the reasons stated above, we affirm, in part, and reverse, in part, the Court of Appeals and remand this case to the trial court for further proceedings consistent with this opinion.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Kenneth Allen Bohnert
Jennifer Fust-Rutherford
Richard M. Sullivan
Conliffe, Sandman, & Sullivan PLLC


COUNSEL FOR APPELLEE:

Gerald Lee Stovall
The Stovall Firm, PLLC

---

[57] *Lewis*, 798 S.W. 2d at 461–62